IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,096

STATE OF KANSAS,
*Appellee*,

v.

BARBARA MARIE FRANTZ,
*Appellant.*

SYLLABUS BY THE COURT

1.

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right of cross-examination, but this right is not absolute, and at times it must bow to accommodate other legitimate interests in the trial process. Trial judges retain wide latitude under the Confrontation Clause to impose reasonable limits on cross-examination.

2.

Criminal defendants have a right to present relevant evidence, but that right is subject to reasonable restrictions, and defendants must still comply with established rules of procedure and evidence.

3.

The Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish. As the party alleging error, the criminal defendant has the burden to prove the district court abused its discretion. Criminal defendants state a violation of the Confrontation Clause by showing they were prohibited from engaging in

1

otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness.

Appeal from Leavenworth District Court; MICHAEL D. GIBBENS, judge. Opinion filed December 30, 2022. Affirmed.

*Joseph A. Desch*, of Law Office of Joseph A. Desch, of Topeka, argued the cause and was on the brief for appellant, and *Barbara Frantz*, appellant pro se, was on the supplemental brief.

*Kristafer Ailslieger*, deputy solicitor general, argued the cause, and *Shawn M. Boyd*, deputy county attorney, *Todd Thompson*, county attorney, and *Derek Schmidt*, attorney general, were with him on the briefs for appellee.

The opinion of the court was delivered by

WALL, J.: Barbara Marie Frantz appeals her conviction for the first-degree premeditated murder of her estranged husband, Gary. Frantz asks this court to reverse her conviction, arguing: (1) the district court violated her Sixth Amendment rights when it imposed limits on her cross-examination of a State's witness; (2) the district court erred in denying her motion for judgment of acquittal at the close of the State's evidence; and (3) there was insufficient evidence to support her conviction. Acting pro se, Frantz also filed a second brief raising several other claims of error.

For the reasons discussed more fully in this opinion, we first conclude the district court's limits on cross-examination were reasonable and did not constitute an abuse of discretion or otherwise deprive Frantz of her confrontation rights under the Sixth Amendment. Second, the State presented evidence during its case sufficient to establish a prima facie case of first-degree, premeditated murder against Frantz. Third, our review of

2

the record confirms the evidence at trial was sufficient to support the jury's verdict. Finally, we hold the issues Frantz raised in her pro se brief fail to demonstrate error. Thus, we affirm her conviction.

FACTS AND PROCEDURAL BACKGROUND

At around 8:30 p.m. on January 27, 2017, Officer Ezekiel Stevenson of the Leavenworth Police Department was dispatched to the Stove Loft Apartments in response to reports that shots had been fired. He found Gary Frantz lying in a parking lot across the street from the apartment complex. Gary had suffered six gunshot wounds, including a sucking chest wound, and he was having difficulty breathing. Gary was surrounded by several fellow Stove Loft tenants when Officer Stevenson arrived at the scene.

Officer Stevenson began administering first aid and questioning Gary about the shooting. Body camera footage recorded the following exchange between Officer Stevenson and Gary:

"Officer Stevenson: Do you know who shot ya, Gary?
"Gary: My [inaudible].
"Officer Stevenson: Hunh?
"Gary: My wife.
"Officer Stevenson: You're wife? What's your wife's name?
"Gary: Barbara.
"Officer Stevenson: Barbara what?
"Gary: Frantz.
"Officer Stevenson: Barbara what?
"Gary: Frantz!
"Officer Stevenson: Frantz? Okay. What did she shoot you for?

3

"Gary: I don't know.

"Officer Stevenson: 'Kay. Were you guys having an argument?

"Gary: No."

About a minute later, Stevenson again asked, "Why did your wife shoot you?" and Gary said, "I don't know." After several minutes, Gary was no longer speaking. He eventually succumbed to his injuries.

Around midnight, law enforcement went to the apartment of Frantz' and Gary's son, Patrick Frantz. They informed Patrick that Gary had died two hours earlier, and they believed Frantz had shot him. While police were at his apartment, Patrick called his maternal grandmother, Rosella Reece, to tell her what had happened. Neither Patrick nor Reece knew Frantz' whereabouts.

After the shooting, law enforcement was on the lookout for Frantz' silver two-door Hyundai Genesis. In the early morning hours of January 28, 2017, they found Frantz' car parked in the driveway of Reece's home in Burlingame. Frantz was still in the car, and law enforcement took her into custody.

Law enforcement recovered eight shell casings from the crime scene. The shell casings were the same type of ammunition that law enforcement found during a search of Frantz' apartment. During that search, law enforcement also found a box for a 9-millimeter handgun with a spent casing inside. A firearm tool mark examiner later determined the eight shell casings from the crime scene and the spent casing found in Frantz' apartment had all been fired from the same gun. But the gun was never located.

The State charged Frantz with the first-degree premeditated murder of Gary. Before trial, Frantz filed a motion to present evidence of an alternative perpetrator. In the motion, she noted some Stove Loft tenants originally described the shooter as a white

4

man, so Frantz wished to present evidence that Patrick was the shooter. After an evidentiary hearing, the district court granted Frantz' motion.

*State's Case in Chief*

*Testimony of Fellow Apartment Tenants*

At Frantz' trial, at least a half dozen tenants of the Stove Loft Apartments testified to witnessing events related to the shooting. Those tenants said they heard several gunshots, a pause, and then several more gunshots. Several tenants said they looked out their window and saw a larger man being chased by a smaller person who was shooting at him. Witnesses generally described the shooter as white and slim, with short hair and wearing a cap. Because the shooter had short hair, one witness originally believed the shooter was a man, but she was "not going to bet [her] life on that." Another witness said the shooter appeared to be a young adult or woman. Several witnesses also testified to seeing the shooter get into a silver or light-colored two-door car before driving off. And one of those witnesses was also able to identify the make of the car as a Hyundai.

After the shooting, several tenants went outside to help Gary. Three tenants testified that before police arrived, they asked Gary who had shot him, and Gary said his wife shot him. And four tenants testified that Gary gave the same response when police later asked him the same question.

At trial, only one tenant, Debra Raynal, identified Frantz and placed her at the crime scene. Raynal testified she went to her window after hearing gunshots on the night of the shooting. She saw someone walking toward a light-colored two-door car. The person got in the car and drove north. Raynal assumed the person was a young man because of the person's clothing and short hair. When police arrived on the scene, Raynal went outside and told them she had seen a young, white man in his 20's.

Despite the initial description she had given to police, Raynal later identified Frantz as the person she saw fleeing the crime scene after the shooting. Raynal testified she first recognized Frantz in the courtroom during a prior motions hearing. Raynal explained she was able to identify Frantz at that time because she could see Frantz' build and view Frantz' face in profile. According to Raynal, this was important because on the night of the shooting, she had observed only the profile of the perpetrator's face. Before that motions hearing, Raynal had seen Frantz' picture in the newspaper but had not recognized Frantz as the shooter because the photographs showed only a frontal view of Frantz' face.

*Patrick's Direct Examination*

The State also called Patrick as a witness. Patrick testified he had moved into an apartment in the Legends area of Kansas City, Kansas, with his parents in May 2014. In early 2016, Gary and Frantz separated, and Frantz moved into another apartment near the Legends. Later that year, Gary and Patrick moved into separate apartments in Leavenworth. By early 2017, Patrick did not have much of a relationship with either of his parents and had little to no contact with them in the weeks before the shooting.

According to Patrick, Frantz "had a few delusional ideas." She believed Gary was trying to poison her. She also believed Patrick and Gary were trying to collect a settlement from KU behind her back. Patrick said he had no knowledge of Gary trying to poison Frantz.

Patrick said he went with Frantz to buy a 9-millimeter handgun in October 2016. He also took her to a shooting range the same day to show her how to load and safely

6

handle the gun. He and his mother went shooting one other time before Thanksgiving 2016. The only other time Patrick handled the gun was when he cleaned it at his mother's apartment.

Patrick testified he worked at the front desk of a hotel near the Legends, and on the night of the shooting, he had worked from 3 p.m. to 11 p.m. A timecard showed Patrick had clocked into work that day at 2:59 p.m. and clocked out at 11:09 p.m. Patrick testified it took him about 20 to 25 minutes to drive home from work, so he would have arrived at his home in Leavenworth around 11:30 p.m. on the night of the shooting.

When law enforcement notified him of Gary's death later that night, Patrick said he was distressed that his father had been murdered. He said he knew his mother was responsible, even before the officers told him she was a suspect, because she is the only one who would want to harm Gary.

*Patrick's Cross-examination*

Frantz fully explored several theories of impeachment during Patrick's cross-examination. Though he told police he had not been in contact with Gary for months, Patrick admitted he sent angry text messages to Gary about a week before the shooting. Gary had a set of Patrick's keys, and Patrick wanted Gary to return the keys in person. Instead, Gary left the keys under a statue outside Patrick's apartment. This angered Patrick because someone could have stolen the keys, and he expressed that anger in a couple of text messages. Patrick explained he had forgotten about those messages until prosecutors showed them to him.

Similarly, Patrick said he had not been in contact with Frantz since Thanksgiving 2016. And he told police he cut off contact with Frantz because she had attacked him. But on cross-examination, Patrick admitted Frantz called the police that Thanksgiving

7

because he would not leave her apartment. Patrick also admitted that Gary had called 911 to complain about Patrick on another occasion. The nature of Gary's complaint was not disclosed at trial.

Defense counsel also questioned Patrick about discrepancies between his account of the phone call with Reece on the night of the shooting and Reece's account. According to Patrick's written statement to police, Reece told him she thought Frantz was going to commit suicide because Frantz left her therapy animal and some belongings at Reece's house a couple days before the shooting and, as she left, Frantz told Reece she would "see [Reece] in heaven."

But Reece said she told Patrick that Frantz had said, "[S]ee you later," after dropping some items off at Reece's house. And Reece did not remember telling Patrick she was concerned Frantz might harm herself. When asked about these discrepancies on cross-examination, Patrick said he was the one who had inferred Frantz might hurt herself, not Reece. He also said he could not remember whether Reece told him Frantz had said "see you in heaven" or "see you later."

Reece also testified that, during the call, Patrick said the shooting happened at 8 p.m. When defense counsel asked Patrick why he said Gary was shot at 8 p.m., Patrick said the police told him Gary was shot at that time. But law enforcement's conversation with Patrick on the night of the shooting was captured on an officer's body camera. And in the video footage, police informed Patrick that Gary passed away two hours earlier. Because the police were talking to Patrick around midnight, that would suggest Gary died around 10 p.m., not 8 p.m.

Frantz also elicited testimony from Patrick suggesting he had a financial interest in Gary's assets and the outcome of the trial. Patrick admitted he had taken action to prevent Frantz from receiving Gary's pension after the murder, and he had been fighting with

8

Frantz' family over Gary's Jeep. Patrick also testified Frantz was the only beneficiary under Gary's life insurance policy, and the outcome of the criminal proceedings could affect how much of Gary's estate Patrick would receive.

*Testimony of the Forensic Pathologist*

Dr. Michael Handler, a forensic pathologist who subspecialized in forensic neuropathology, performed Gary's autopsy. He testified Gary's cause of death was multiple gunshot wounds, including a wound that perforated Gary's right lung. Dr. Handler explained the injury to Gary's lung would have made it much more difficult for Gary to breathe and would have affected his thought processes. But Dr. Handler added that Gary's injuries would not have rendered him incoherent or delusional. Dr. Handler also did not observe any injuries to Gary's brain or any other brain disease that would have altered Gary's cognition. Thus, Dr. Handler opined there was "no reason to believe that [Gary's] brain is incapable of saying what he wants to say until the moment he dies."

*State's Exhibits*

As part of its case in chief, the State played the video of Gary's dying declarations made to Officer Stevenson and the video of law enforcement's conversation with Patrick on the night of the shooting. In the latter video, Patrick told police he had not talked to Gary in a while and wanted nothing to do with Gary because of the way Gary had handled Frantz' medical problems. Patrick also said he had always disliked Gary and hated him for his mistreatment of Frantz, but Patrick did not condone what Frantz had done.

The video of Patrick's conversation with police also shows that Patrick had a goatee at the time. But Raynal and another Stove Loft tenant had testified the shooter had no facial hair.

9

The State also presented several posts from Frantz' Facebook page. In a lengthy message posted on the day of the shooting, Frantz wrote, "To my Mom I thank you for my life. I love you with all my heart. I will see you again someday." Later in the post, Frantz wrote,

> "My ex-husband that I have been there so much for Stood Beside you took care of you loved honored respected. I have been raped by you I've had [*sic*] been cheated on by you and you helped end my life. Only to have you destroy me I hope you rot in hell if not I hope you rot in prison."

In several other posts, Frantz accused Gary of abusing her and cheating on her. She also called him "pathetic," "cowardly," "a liar," and "a piece of shit."

*Defense Evidence*

Frantz called several witnesses in her defense. Frantz' ex-sister-in-law, Della Beauclair, testified she was at Reece's house the day after the shooting when Patrick came over. She described Patrick's demeanor as "odd" and "emotionless." According to Beauclair, Patrick said he did not care if Gary was dead or alive, and he was more worried about Reece than he was about what had happened to Gary. Beauclair also testified that Patrick said he left work early the day of the shooting because he was sick, and he had asked someone to cover for him. Patrick also said he thought it was odd there was not much blood at the crime scene. Beauclair asked if Patrick had been to the crime scene, and Patrick said he had not but police said there was not much blood at the scene.

Frantz also called Jennifer Johnson, a registered nurse with a doctorate in nursing practice. Johnson had watched the video from Officer Stevenson's body camera, which showed Gary having difficulty breathing and speaking. She opined Gary had been

suffering from hypoxia, a condition in which the brain or other organs are not receiving enough oxygen. She explained that when the brain is not receiving enough oxygen, an individual can experience memory and word loss, and otherwise have difficulty communicating. According to Johnson, there was "really no way to know whether or not [Gary] understood or could effectively articulate what he was trying or meaning to say."

Frantz also presented a short clip of the video from Officer Stevenson's body camera. The video had been slowed down to highlight Gary's first answer when Stevenson asked who shot him. Frantz argued the clip showed Gary had originally said, "My boy."

*Conviction, Sentence, and Appeal*

The jury convicted Frantz of first-degree premeditated murder. The district court sentenced her to life imprisonment without the possibility of parole for 25 years. Because the district court imposed a life sentence, Frantz appealed directly to our court. Jurisdiction is proper. See K.S.A. 2021 Supp. 22-3601(b)(3).

Additional facts will be provided in the analysis as needed to resolve the issues raised by the parties.

ANALYSIS

Frantz contends her conviction should be reversed because: (1) the district court limited the scope of Patrick's cross-examination; (2) the district court erred in denying Frantz' motion for judgment of acquittal at the close of the State's evidence; and (3) the evidence was insufficient to support the jury's verdict. In her pro se briefing, Frantz raises several other claims of error. We address each of these challenges in turn.

11

I.    *The District Court Did Not Abuse Its Discretion or Violate Frantz' Sixth Amendment Confrontation Clause Rights by Limiting Her Cross-examination of Patrick*

For her first issue on appeal, Frantz argues the district court erred by limiting her cross-examination of Patrick. To fully resolve the issue and the parties' competing arguments, we first identify several additional facts relevant to Frantz' Sixth Amendment challenge. Second, we identify the applicable legal framework and controlling standard of our review. Third, we discuss how certain preservation questions complicate our substantive review and explain how we resolve those issues in this case. Finally, we analyze the merits of Frantz' challenge and ultimately affirm the district court's rulings.

A.    *Additional Relevant Facts*

At trial, the district court excluded two lines of inquiry during the defense's cross-examination of Patrick—questions about Patrick's hospitalization for depression and questions about an alleged prior threat Patrick made to his girlfriend.

As to Patrick's hospitalization for depression, the subject was first addressed during the evidentiary hearing on Frantz' motion to present evidence of an alternate perpetrator. At that hearing, Patrick's partner, Kelly Neumann, testified she began dating Patrick several months after Gary's death. Neumann said she had Patrick hospitalized three times in 2017 "[f]or depression; for suicidal tendencies; for, you know, erratic behavior; for just sadness." According to statements Patrick had made to her, Neumann understood Patrick to be depressed because he was very close to his mother and she was in custody. Neumann added that Patrick had also lost his dad and "he was not emotionally prepared to handle his own life."

As to the prior threats Patrick purportedly made to his girlfriend, the subject was also addressed at the hearing on Frantz' motion to present evidence of an alternate

12

perpetrator. At that hearing, Neumann testified that in December 2017, 11 months after the killing, Patrick was heavily medicated and became aggressive with her. Neumann said Patrick "may have" said he could kill her at the time, but she could not remember. Later, the following colloquy took place:

"Q: Okay. Has he ever told you that he could kill you and get away with it?
"A: No. I don't—no.
"Q: Okay. Would you ever tell anybody that he said that?
"A: No.
"Q: Okay. So you never said, Patrick told me he could kill me and get away with it?
"A: I don't believe so, no.
"Q: Okay. Well, you don't believe so or no?
"A: I don't—I mean—it was a—when he was medicated [for depression], he would mumble and say a lot of things. He would also cry at the drop of a hat. So, you know, things like that."

At trial, defense counsel attempted to cross-examine Patrick on both subjects—his hospitalization for depression and the alleged prior threat. First, defense counsel inquired about Patrick's hospitalization, asking him, "In fact, you were—after [Gary's murder] occurred, you actually went to the hospital; correct?" The State asked to approach, telling the court "I believe that the defense attorney is trying to get into Patrick being hospitalized regarding some depression." The State objected to this line of inquiry, arguing Patrick's hospitalization for depression would be improper impeachment because it involved a specific instance of conduct and was also irrelevant.

Defense counsel argued they were not asking the question to adduce character evidence, but to impeach Patrick's direct testimony. Defense counsel explained Neumann had previously testified at a motion hearing that Patrick said he was depressed because he was close to his mother and she was in custody. Defense counsel claimed that Patrick's statement was inconsistent with his testimony on direct examination that he thought his

13

mom killed Gary and she was the only one who could have done it. Defense counsel also claimed Patrick was hospitalized because he was suicidal, which showed consciousness of guilt. According to the defense, excluding evidence related to Patrick's hospitalization would violate Frantz' Sixth Amendment right to present a defense.

The district court sustained the State's objection. It ruled that if the evidence of Patrick's depression and hospitalization was being offered as character evidence affecting his credibility, it was inadmissible under K.S.A. 60-422(c). The court stated the evidence was also likely inadmissible under K.S.A. 60-446 because Patrick's character was not in issue.

Later during Patrick's cross-examination, the defense also inquired about Patrick's alleged prior threat to his girlfriend:

> "Q: . . . Had you ever made threats to your father?
> "A: No.
> "Q: Have you—had you ever made threats to anyone?
> "A: No.
> "Q: Never told your girlfriend you could kill her and get away with it."

The State objected to defense counsel's question about Patrick's purported threat to his girlfriend, arguing it was improper character evidence founded on a specific instance of conduct. The State also argued the alleged threat was not relevant to the identity of Gary's killer. Defense counsel responded: "I asked if he ever threatened to kill his father. . . . He said no. So I asked, have you ever threatened to kill anyone, and he said no. But he has said he can kill and get away with it." Beyond impeachment, defense counsel argued the alleged threat was also relevant because it was an admission by Patrick that he had killed before.

14

The district court found the alleged threat did not constitute an admission that Patrick had previously killed someone. The court also ruled that defense counsel could not impeach Patrick by asking him about the alleged threat against Neumann because that threat was not otherwise relevant. However, the court clarified that the defense could impeach Patrick's statement (that he had never threatened anyone) by calling a witness who would testify to having been threatened by Patrick. The defense called no such witness at trial.

Frantz renewed her objections to these two rulings in her motion for new trial. Frantz again claimed those limitations violated her Sixth Amendment right to present a defense. In its order denying Frantz' motion, the district court ruled that the evidence regarding Patrick's mental health and hospitalization was inadmissible under K.S.A. 60-422(d), reasoning:

"The defense effort to cross examine Patrick Frantz about his mental health and hospitalization following the murder of his father was relevant as tending to prove a trait of his character. The trait the defense was trying to prove could be inferred to be honesty or veracity. The trait could not be proven by acts of specific conduct such as his mental health but by opinion testimony only."

The district court also upheld its ruling to limit Frantz' inquiry into the alleged threat Patrick made against Neumann. The court found there was insufficient evidence the alleged threat was ever made and defense counsel's question would have been prejudicial, even if Patrick had denied making the threat.

On appeal, Frantz argues the evidence regarding Patrick's hospitalization for depression and the alleged threat were important to her defense. She argues the jury would have had more information about Patrick's personality and possible motive to kill

15

Gary if she had been allowed to pursue these lines of questioning. She claims the district court's limitations on her cross-examination of Patrick served no legitimate purpose and thus violated her Sixth Amendment right to cross-examine witnesses against her.

B. *Relevant Legal Framework and Standard of Review*

The Sixth Amendment's Confrontation Clause guarantees a criminal defendant the right "to be confronted with the witnesses against him." U.S. Const. amend. VI. Implicit in this right of confrontation is a criminal defendant's right of cross-examination. *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973); *State v. Thomas*, 307 Kan. 733, 738, 415 P.3d 430 (2018). But this right is not absolute, and at times it must "'bow to accommodate other legitimate interests in the criminal trial process.'" *Thomas*, 307 Kan. at 738.

As the United States Supreme Court has explained, the Sixth Amendment guarantees an *opportunity* for cross-examination to establish a witness' bias, not unlimited cross-examination for any purpose:

> """The main and essential purpose of confrontation is to *secure for the opponent the opportunity of cross-examination*."' Of particular relevance here, '[w]e have recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' It does not follow, of course, that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant. And as we observed earlier this Term, 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and

to whatever extent, the defense might wish.' *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985). [Citations omitted.]" *Delaware v. Van Arsdall*, 475 U.S. 673, 678-79, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).

Likewise, criminal defendants have a right to present relevant evidence, but that right is subject to reasonable restrictions. *United States v. Scheffer*, 523 U.S. 303, 308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998). "[S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials." 523 U.S. at 308. And "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302; see *State v. Stano*, 284 Kan. 126, 131, 159 P.3d 931 (2007). For these reasons, reviewing courts have traditionally been reluctant to impose constitutional constraints on ordinary evidentiary rulings made by trial courts. See *Crane v. Kentucky*, 476 U.S. 683, 689, 106 S. Ct. 2142, 90 L. Ed. 2d 636 (1986); *United States v. Austin*, 933 F.2d 833, 842 (10th Cir. 1991).

"Because a district court may exercise reasonable control over the scope of cross-examination, appellate courts review the court's decision to limit cross-examination for an abuse of discretion." *Thomas*, 307 Kan. at 739. And to the extent this issue also involves the district court's decision to limit cross-examination based on evidentiary rulings, those rulings are also reviewed for an abuse of discretion. *State v. Atkinson*, 276 Kan. 920, 925, 80 P.3d 1143 (2003). "A district court abuses its discretion when (1) no reasonable person would have taken the view adopted by the district court; (2) the judicial action is based on an error of law; or (3) the judicial action is based on an error of fact." *Thomas*, 307 Kan. at 739.

As the party alleging error, Frantz has the burden to prove the district court abused its discretion. 307 Kan. at 739. "[A] criminal defendant states a violation of the

17

Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.' *Davis v. Alaska*, [415 U.S.] at 318." *Van Arsdall*, 475 U.S. at 680.

### C. *Preservation Questions*

Before addressing the merits of this issue, we pause to address potential preservation issues. Kansas law generally requires the proponent of excluded evidence to proffer sufficient evidence to the trial court to preserve the issue for appellate review. K.S.A. 60-405. And the failure to make an adequate proffer precludes review because the appellate court has no basis to consider whether the trial court abused its discretion. *State v. Evans*, 275 Kan. 95, 100, 62 P.3d 220 (2003).

At trial, Frantz did not make a proffer to establish how Patrick would have answered the challenged questions or testified in response to the excluded lines of questioning. Frantz proffered only some of the substance of Neumann's testimony from the motion hearing. But the district court judge who heard the testimony at that motion hearing did not preside over the trial. Thus, the trial court judge may not have been aware of the entire substance of Neumann's testimony at the time of his rulings. Furthermore, Frantz' arguments on appeal address only the limitations on Patrick's cross-examination. We question whether Frantz' partial proffer of Neumann's testimony was adequate for purposes of reviewing the issue on appeal.

Nevertheless, neither party has briefed whether Frantz provided an adequate proffer. See *State v. Davis*, 313 Kan. 244, 248, 485 P.3d 174 (2021) (an issue not briefed is deemed waived or abandoned). And, more importantly, the State does not object. Thus,

18

we will reach the merits of Frantz' argument. And for that purpose, we assume Patrick would have testified consistently with Neumann's testimony at the motion hearing.

D. *The District Court's Limits on Patrick's Cross-examination Did Not Violate Frantz' Right to Confrontation.*

The district court made two evidentiary rulings that had the effect of limiting the scope of Frantz' cross-examination of Patrick. To thoroughly evaluate Frantz' claim that these rulings violated her Sixth Amendment right to confrontation, we first analyze each of the evidentiary rulings for potential error under Kansas' rules of evidence. Then, we explore whether the limitations were reasonable, considering the scope of Frantz' cross-examination of Patrick in its entirety.

1. *The District Court Did Not Err by Excluding Evidence of Patrick's Hospitalization for Depression*

As previously noted, Frantz did not make a proffer of the excluded testimony. But for purposes of our analysis, we assume for the sake of argument Patrick would have testified he was hospitalized for depression, suicidal tendencies, and erratic behavior, and his depression was caused by Frantz' incarceration and Gary's death.

In its evidentiary ruling, the district court found Frantz' question about Patrick's hospitalization for depression was calculated to elicit character evidence affecting Patrick's credibility. And on appeal, Frantz does not directly challenge the district court's characterization of the excluded testimony as character evidence. Nonetheless, the record indicates Frantz may have offered additional grounds for admitting Patrick's testimony, including that such testimony could have been used to impeach Patrick with a prior inconsistent statement or to show Patrick's consciousness of guilt. Thus, we first review the district court's ruling under the evidentiary rules governing the admission of character

19

evidence. Then, we address whether the evidence was otherwise admissible as impeachment evidence or to establish Patrick's consciousness of guilt.

First, when viewing the excluded testimony as potential character evidence, several statutes govern our analysis of the district court's ruling. K.S.A. 60-420 generally allows any party to admit evidence relevant to the credibility of a witness:

"Subject to K.S.A. 60-421 and 60-422, for the purpose of impairing or supporting the credibility of a witness, any party including the party calling the witness may examine the witness and introduce extrinsic evidence concerning any conduct by him or her and any other matter relevant upon the issues of credibility."

But this general rule is subject to several limitations. Relevant here, K.S.A. 60-422 excludes evidence of any character trait other than honesty or veracity, and it prevents a party from establishing a witness' character traits through specific instances of conduct:

"As affecting the credibility of a witness . . . (c) evidence of traits of his or her character other than honesty or veracity or their opposites, shall be inadmissible; (d) evidence of specific instances of his or her conduct relevant only as tending to prove a trait of his or her character, shall be inadmissible."

Even so, evidence of specific instances of a witness' conduct can be admissible when character is in issue at trial. K.S.A. 60-446 ("When a person's character or a trait of his or her character is in issue, it may be proved by testimony in the form of opinion, evidence of reputation, or evidence of specific instances of the person's conduct."); see also *State v. Price*, 275 Kan. 78, 91, 61 P.3d 676 (2003) (K.S.A. 60-446 "'deals with the rather rare situations where character is an ultimate issue [i.e., a fact necessary to liability, defense or damages] as contrasted with the use of character merely as circumstantial evidence of another fact.'").

20

If, as Frantz argues on appeal, testimony regarding Patrick's hospitalization for depression would show his violent character, then such evidence was offered to establish a character trait other than honesty or veracity. K.S.A. 60-422(c) makes clear that evidence establishing any character trait other than honesty or veracity, or their opposites, shall be inadmissible. Thus, to the extent Frantz intended to offer Patrick's testimony to establish his propensity toward violence, the district court properly excluded such evidence under K.S.A. 60-422(c).

If, as Frantz seemed to argue to the district court, this testimony was offered to prove Patrick's dishonesty or lack of veracity, that testimony would relate to a specific instance of conduct (his hospitalization) and would be inadmissible under K.S.A. 60-422(d). Further, the district court also found evidence regarding Patrick's hospitalization for depression, a specific instance of conduct, would not be admissible under K.S.A. 60-446 because Patrick's character was not an ultimate issue at trial. On appeal, Frantz does not challenge the district court's ruling under K.S.A. 60-446. For these reasons, we conclude the district court did not err in excluding Patrick's testimony as improper character evidence.

Second, the record also suggests Frantz wanted to question Patrick about his depression and hospitalization to impeach him with a prior inconsistent statement. Frantz believed Patrick's statements to Neumann—that he was depressed because his mother was in custody—would impeach Patrick's testimony on direct examination that he believed Frantz had killed Gary. But a witness' prior statement is only proper impeachment material if it contradicts or is inconsistent with what the witness has said on the stand. *State v. Worth*, 217 Kan. 393, 396, 537 P.2d 191 (1975). We see no incongruity between Patrick's prior statement that he was depressed because his mother was in custody for killing his father and Patrick's testimony that he believed his mother committed the crime. Because Patrick's prior statement to Neumann was not appropriate

impeachment evidence, the district court did not err by excluding it. See *Worth*, 217 Kan. at 395-96 (district court did not err in striking witness' prior testimony offered for impeachment purposes when that testimony was not inconsistent with witness' direct testimony).

Finally, Frantz argued Patrick's hospitalization for suicidal tendencies showed a guilty conscience, and thus would constitute circumstantial evidence that Patrick killed Gary. Evidence of a defendant's conduct following the commission of an alleged crime may be circumstantially relevant and thus admissible to establish the defendant's consciousness of guilt. *State v. Webber*, 260 Kan. 263, 274, 918 P.2d 609 (1996); *State v. Cathey*, 241 Kan. 715, 730, 741 P.2d 738 (1987), *disapproved of on other grounds by State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006). And "'[c]ircumstantial evidence that would be admissible and support a conviction if introduced by the State cannot be excluded by a court when offered by the defendant to prove his or her defense that another killed the victim.'" *State v. Burnett*, 300 Kan. 419, 433, 329 P.3d 1169 (2014).

While Kansas courts have not broached the issue, other jurisdictions have held that suicide attempts, as well as suicidal ideations, may be admissible to establish a person's consciousness of guilt. See, e.g., *Commonwealth v. Sanchez*, 416 Pa. Super. 160, 175-76, 610 A.2d 1020 (1992) (listing decisions from other jurisdictions finding suicide attempts evidence of consciousness of guilt and finding evidence of suicidal thoughts admissible for same purpose); see also 73 A.L.R.5th 615 (discussing admissibility of evidence relating to accused's suicide attempt). But these courts have generally found such evidence admissible only when there is a sufficient nexus between the crime and the suicide attempt to support an inference the defendant was attempting to evade prosecution by committing suicide. See *Mathis v. State*, 287 So. 3d 1268, 1270 (Fla. Dist. Ct. App. 2019) ("Courts have recognized suicide attempts to be 'indicative of a desire to avoid prosecution and [a] circumstance from which guilt may be inferred.'"); *Lamerand v. State*, 540 S.W.3d 252, 261 (Tex. App. 2018) ("Keith attempted suicide shortly after

22

learning that he had been accused of sexually assaulting Kathryn and that the police were investigating him. Given the timing, a jury could have reasonably inferred that Keith's suicide attempt evidenced a consciousness of guilt.").

Assuming, without deciding, that evidence of suicidal ideations can be probative of a witness' state of mind and may tend to establish a guilty conscience in certain circumstances, Frantz has not proffered a sufficient nexus between Patrick's suicidal thoughts and Gary's murder to support that inference. And based on the record before us, no such nexus exists. Patrick never faced prosecution for Gary's murder. And Patrick was hospitalized for depression months after Gary's death. See *Meggison v. State*, 540 So. 2d 258, 259 (Fla. Dist. Ct. App. 1989) (finding defendant's suicide attempt after pleading guilty not probative of flight from pending prosecution); *People v. Foster*, 56 Ill. App. 3d 22, 32, 371 N.E.2d 961 (1977) (finding defendant's suicide attempt not probative of consciousness of guilt because not made in close temporal proximity to murder), *rev'd on other grounds by* 76 Ill. 2d 365, 392 N.E.2d 6 (1979).

Moreover, on appeal, Frantz does not mention Patrick's suicidal ideations. Frantz argues only that she should have been allowed to question Patrick about his hospitalization for depression. But any potential nexus between Patrick's general depression and his alleged guilt would be even more tenuous than the nexus between his suicidal ideations and his alleged guilt. We conclude the district court did not err in excluding this evidence.

2. *The District Court Did Not Err by Limiting Frantz' Ability to Elicit Testimony During Patrick's Cross-examination of an Alleged Threat He Made Against His Girlfriend*

Frantz also argues the district court should have admitted Patrick's testimony in response to her question whether he had previously told Neumann he could kill her and get away with it. Again, Frantz did not make a proffer to establish how Patrick would

23

have answered any questions about the alleged threat, so we will assume for the sake of argument that Patrick would have testified consistently with Neumann's testimony at the motion hearing.

Frantz claims the alleged threat was a statement against interest suggesting Patrick had previously killed someone. And she asserts Patrick's admission that he had killed before would be relevant to whether he killed Gary. Alternatively, Frantz argues the testimony was admissible to establish Patrick's propensity toward violence and to impeach his prior testimony that he had never threatened anyone. We address each of these arguments in turn.

First, Frantz contends the excluded testimony was an admission against Patrick's interests and was relevant to the identity of the shooter. If Patrick had admitted to killing someone before, that admission might have been relevant because it could have some tendency to prove the identity of Gary's killer. See *State v. Page*, 303 Kan. 548, 550, 363 P.3d 391 (2015) (quoting K.S.A. 60-401[b]) ("Relevant evidence is evidence that has "'any tendency in reason to prove any material fact.'""). And "[g]enerally, all relevant evidence is admissible. K.S.A. 60-407(f)." *State v. Miller*, 308 Kan. 1119, 1167, 427 P.3d 907 (2018). But the district court did not limit cross-examination because Patrick's admission or statement against interest was not relevant. Instead, the district court found Patrick's alleged threat was not an admission or statement against interest in the first place. We agree.

The phrase "I could kill you and get away with it" expresses a mere possibility or hypothetical—it is not confirmation of past conduct. See The American Heritage Dictionary of the English Language 416 (5th ed. 2011) ("[C]ould" is "[u]sed with hypothetical or conditional force:  If we could help, we would."). While someone might be confident in their ability to get away with murder because they had done so previously, the purported threat attributed to Patrick does not support that connotation.

24

Second, Frantz argues she should have been allowed to question Patrick about the alleged threat to establish Patrick's character trait of being prone to violence. But as the State argues, if Frantz wished to question Patrick about the threat to establish his propensity for violence and suggest Patrick killed Gary, any testimony it could elicit would be inadmissible under K.S.A. 60-447. That statute provides that "when a trait of a person's character is relevant as tending to prove conduct on a specified occasion . . . evidence of specific instances of conduct other than evidence of conviction of a crime which tends to prove the trait to be bad shall be inadmissible." K.S.A. 60-447(a). Because the alleged threat would have been a specific instance of conduct (other than a conviction) offered to prove Patrick's violent character, its admission was prohibited by K.S.A. 60-447(a).

And if Frantz wished to question Patrick about the alleged threat to establish Patrick's character trait of being prone to violence, any testimony the question could elicit would also be inadmissible under K.S.A. 60-422 for two reasons. First, the alleged threat would have established a character trait other than dishonesty or lack of veracity and thus been inadmissible under K.S.A. 60-422(c) (evidence of witness' character traits unrelated to honesty or veracity inadmissible). Second, the alleged threat would have been a specific instance of Patrick's conduct offered to prove a trait of his character and would be inadmissible under K.S.A. 60-422(d) (evidence of specific instances of conduct relevant to prove witness' character trait inadmissible).

Finally, Frantz contends she should have been allowed to question Patrick about the alleged threat against his girlfriend to impeach his earlier testimony on cross-examination. As previously noted, Frantz first asked if Patrick had ever threatened Gary, which Patrick denied. Next, Frantz asked if Patrick had ever threatened anyone, which

25

Patrick also denied. Frantz then asked if he had ever told his girlfriend that he could kill her and get away with it. Only this third question drew an objection from the State, which the district court sustained.

Frantz argues she should have been allowed to question Patrick about the alleged threat to impeach his testimony that he had never threatened anyone. But based on the record before us, Frantz has failed to establish any error on this basis. Again, we assume Patrick would have testified consistently with Neumann's testimony at the motion hearing. But Neumann's testimony regarding the alleged threat was, at best, ambiguous. She initially denied that Patrick had told her he could kill her and get away with it. When pressed further, she responded by saying Patrick would say things under his breath. But she never specifically testified Patrick made the alleged threat. In short, the record before us fails to establish Patrick ever threatened Neumann. And we cannot conclude the district court abused its discretion by preventing Frantz from questioning Patrick about an alleged threat that was never substantiated. See *State v. Vonachen*, 312 Kan. 451, 460, 476 P.3d 774 (2020) (appellant has burden to provide record sufficient to establish claimed error).

Furthermore, the district court did not preclude Frantz from impeaching Patrick's testimony that he had never threatened anyone. We note Frantz' second question— whether Patrick had threatened anyone—elicited testimony regarding a specific instance of Patrick's conduct. And that testimony may have been inadmissible under K.S.A. 60-447, K.S.A. 60-422(d), or both. We need not decide that question today because the State did not object to that inquiry. But the district court also recognized the State's failure to object to Frantz' inquiry opened the door for her to impeach Patrick's testimony that he had never threatened anyone in the past. Thus, the district court ruled that Frantz could impeach that testimony by calling a rebuttal witness or witnesses to testify to prior threats Patrick had directed toward them. Frantz did not accept this invitation, however.

26

The district court's ruling complies with K.S.A. 60-420, which permits parties to impair or support a witness' credibility through cross-examination, through the introduction of extrinsic evidence, or both. See also *State v. Beans*, 247 Kan. 343, 346, 800 P.2d 145 (1990) (holding defendant need not first cross-examine witness before presenting extrinsic evidence impeaching witness' direct testimony). The district court's ruling is also consistent with our caselaw holding defendants should be allowed to present rebuttal evidence when necessary to impeach purportedly false testimony from a key witness for the State. See, e.g., *State v. Macomber*, 241 Kan. 154, 159, 734 P.2d 1148 (1987) (district court committed reversible error when it excluded evidence of a key witness' drug use when that evidence was offered to show the witness had testified falsely about her drug use). Frantz fails to explain how limiting the method of impeachment (through rebuttal witness rather than cross-examination), as opposed to preventing her from impeaching Patrick at all, constitutes an abuse of discretion. Instead, Frantz' opportunity to call a rebuttal witness to impeach Patrick's testimony further illustrates the reasonableness of the district court's limitation on cross-examination. See *Van Arsdall*, 475 U.S. at 679; *Thomas*, 307 Kan. at 741.

Based on the foregoing analysis, we conclude the district court's evidentiary rulings impacting the scope of Patrick's cross-examination were either legally and factually sound or otherwise correct under Kansas' rules of evidence. See *State v. Robinson*, 293 Kan. 1002, 1027, 270 P.3d 1183 (2012) (upholding district court's evidentiary ruling as right for the wrong reason).

3. *The Limits on Cross-examination Did Not Violate the Sixth Amendment*

Even though the district court's limitations on her cross-examination complied with applicable statutes, Frantz nevertheless contends the limits on cross-examination

27

violated the Sixth Amendment because they served no legitimate purpose and impaired her ability to confront a key witness for the State. We disagree with both contentions.

First, we reject Frantz' assertion that the limits on Patrick's cross-examination served no legitimate purpose. The challenged limitations were the byproduct of the district court's reasonable interpretation and application of the Kansas rules of evidence. Our established rules of evidence exist to ensure the fairness, reliability, and efficiency of trials. See *Chambers*, 410 U.S. at 302; *State v. Humphrey*, 217 Kan. 352, 364, 537 P.3d 155 (1975). Thus, the exclusion of inadmissible evidence concerning Patrick's personal health history and the alleged prior threat to Neumann served legitimate interests in the trial process. See *Van Arsdall*, 475 U.S. at 679 (trial judges have wide latitude to impose reasonable limits on cross-examination based on concerns about harassment and questioning that is only marginally relevant).

Second, Frantz was given a constitutionally sufficient opportunity to cross-examine Patrick. In deciding whether the district court's limits on cross-examination impaired Frantz' Sixth Amendment rights, we must consider whether Frantz was still able to "'engag[e] in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby "to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness."'" *Atkinson*, 276 Kan. at 929 (quoting *Van Arsdall*, 475 U.S. at 680). In other words, we must determine "whether a reasonable jury would have received a significantly different impression of the witness' credibility had counsel pursued the proposed line of cross-examination." *United States v. Garcia*, 13 F.3d 1464, 1469 (11th Cir. 1994) (citing *Van Arsdall*, 475 U.S. at 680).

The record shows that even with the district court's limits, Frantz extensively cross-examined Patrick. Frantz' cross-examination of Patrick takes up 141 pages of the trial transcript, compared to only 34 pages of his direct examination. During Patrick's

28

cross-examination, Frantz elicited testimony directly supporting her theory of defense that Patrick was the shooter and disclosing Patrick's potential motives and biases. For example, Frantz elicited testimony that (1) Patrick had sent angry text messages to Gary six days before the shooting but told police he had not had contact with Gary for weeks; (2) Patrick told a detective that he thought Frantz had bought a gun from Cabela's when he in fact knew she did because he went with her; (3) Gary had called 911 on Patrick before; (4) Frantz had called the police on Patrick before; (5) Patrick had access to Frantz' apartment; (6) the outcome of the trial could affect how much of Gary's property Patrick would inherit; (7) Patrick told Neumann that he hated Gary; and (8) Patrick testified police had told him Gary was shot at 8 p.m. even though bodycam video showed police had indicated only that Gary had died from a gunshot wound around 10 p.m.

Frantz asserts the jury would have had even more information about Patrick if she had been allowed to pursue the excluded lines of questioning. But the touchstone for whether the Confrontation Clause has been satisfied is not whether the defendant was able to engage in "'cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" *Van Arsdall*, 475 U.S. at 679. Instead, the proper inquiry is whether the defendant was able to present sufficient information for the jury to make a discriminating appraisal of the witness' motives and bias. *United States v. Mullins*, 613 F.3d 1273, 1283 (10th Cir. 2010); see also *Van Arsdall*, 475 U.S. at 680 (limits on cross-examination violate Confrontation Clause where they prevent defendant from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness). Here, the district court's limitations did not prevent Frantz from providing the jury with sufficient information to make a discriminating appraisal of Patrick's credibility. Through cross-examination, Frantz was able to put before the jury facts showing Patrick had motive and opportunity to murder Gary as well as a potential bias to frame Frantz—either because he did it, because he wanted to receive the entirety

29

of Gary's estate, or both. The limitations the district court placed on Patrick's cross-examination only prevented Frantz from adducing evidence that was inadmissible and would not have given the jury a significantly different impression of Patrick's credibility.

We conclude the district court did not abuse its discretion by limiting Frantz' cross-examination of Patrick. The challenged limitations served legitimate interests in the trial process by excluding testimony that was inadmissible under our rules of evidence. And those limits did not prevent Frantz from engaging in the otherwise appropriate cross-examination of Patrick. Because the district court's limitations fell within the wide latitude afforded to courts to impose reasonable limitations on cross-examination, we hold Frantz' Confrontation Clause rights were not violated.

II. *The District Court Did Not Err by Denying Frantz' Motion for Judgment of Acquittal at the Close of the State's Evidence*

Next, Frantz argues the district court erred by denying her motion for judgment of acquittal after the close of the State's evidence. Frantz contends she was entitled to a judgment of acquittal because of the lack of direct evidence identifying her as the person who shot Gary. Before reaching the merits of this challenge, we first discuss a potential waiver issue under our established precedent.

A. *Waiver Rule Adopted by this Court*

In *State v. Blue*, 225 Kan. 576, 578, 592 P.2d 897 (1979), we held that when a defendant unsuccessfully moves for judgment of acquittal at the close of the State's evidence and then proceeds to present evidence, the defendant waives any error in denial of the motion. We later modified this rule to provide that a defendant does not waive error if he or she presents only rebuttal evidence confined to the substance and credibility of the witnesses for the State or a codefendant and does not try to refute any elements of

30

proof adduced in the State's case. *State v. Copes*, 244 Kan. 604, 610-11, 772 P.2d 742 (1989); see also *State v. Murdock*, 286 Kan. 661, 670-71, 187 P.3d 1267 (2008) (recognizing *Copes* modified waiver rule). "If the motion for acquittal is renewed after the close of all of the evidence, the trial court should consider *all* of the evidence in ruling upon that motion." *Copes*, 244 Kan. at 607.

This rule has been adopted by the federal appellate circuits and appears to have been adopted by many, if not most, states. See, e.g., *United States v. Foster*, 783 F.2d 1082, 1085 & n.1 (D.C. Cir. 1986) (stating "[a]ll eleven numbered circuits and the District of Columbia Court of Appeals are now on record . . . as adhering to the waiver rule" and listing cases in footnote); *Thomas v. State*, 330 Ark. 442, 446, 954 S.W.2d 255 (1997) ("A defendant who goes forward with the production of additional evidence after a directed-verdict motion is overruled waives any further reliance upon the former motion."); *State v. Seeley*, 326 Conn. 65, 71, 161 A.3d 1278 (2017) ("The so-called waiver rule provides that, when a motion for [a judgment of] acquittal at the close of the state's case is denied, a defendant may not secure appellate review of the trial court's ruling without [forgoing] the right to put on evidence in his or her own behalf."); *Cox v. State*, 19 N.E.3d 287, 290 (Ind. Ct. App. 2014) ("[O]ne who elects to present evidence after a denial of [her] motion for directed verdict made at the end of the State's case waives appellate review of the denial of that motion."); *State v. Tscheu*, 758 N.W.2d 849, 857 n.7 (Minn. 2008) ("[W]e have held that where a defendant chooses to introduce evidence after his motion for judgment of acquittal has been denied, we consider the 'whole record' and not just the evidence produced by the State."); *Woods v. State*, 242 So. 3d 47, 54 (Miss. 2018) ("When the defendant proceeds with his case after the state rests and the court overrules the defendant's motion for a directed verdict, the defendant has waived the appeal of that directed verdict."); *State v. Smith*, 944 S.W.2d 901, 916 (Mo. 1997) (by presenting evidence in his own defense after State rested, defendant waived challenge to sufficiency of evidence raised in motion for judgment of acquittal at close of State's evidence); *State v. Combs*, 297 Neb. 422, 430, 900 N.W.2d 473 (2017) (if court

denies defendant's motion to dismiss or for directed verdict at end of State's case, and defendant proceeds to present evidence, defendant waives appellate review of denial of motion); *State v. Hill*, 163 N.H. 394, 395-96, 42 A.3d 842 (2012) (when court denies challenge to sufficiency of evidence after close of State's case, and defendant proceeds to present evidence, court reviews entire trial record); *State v. Kinsella*, 796 N.W.2d 678, 682 (N.D. 2011) ("[O]ur adherence to the waiver rule is consistent with the position taken by the federal circuit courts of appeals and the majority of state courts."); *State v. Phillips*, 416 S.C. 184, 191 n.7, 785 S.E.2d 448 (2016) ("Under the waiver rule, a defendant who presents evidence in his own defense waives the right to have the court review the denial of directed verdict based solely on the evidence presented in the State's case-in-chief."); *State v. Gilley*, 297 S.W.3d 739, 763 (Tenn. Crim. App. 2008) (defendant waived right to appeal denial of motion for judgment of acquittal at close of State's case because he presented evidence); *State v. Griffith*, 129 Wash. App. 482, 489, 120 P.3d 610 (2005) ("When a defendant presents a defense case in chief, he waives his right to appeal the denial of his motion to dismiss made at the end of the State's case in chief."); *McEuen v. State*, 388 P.3d 779, 782 (Wyo. 2017) ("We have previously held that a defendant's introduction of evidence following denial of a judgment of acquittal is a waiver of the appeal of that motion."). But see *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1200-01 (9th Cir. 2000) (failure to renew motion for judgment of acquittal at end of trial, after motion has been made at end of the government's case, does not mean that it has been waived, but only that higher standard of review is to be imposed); 2A Wright & Miller, Fed. Prac. & Proc. Crim. § 463 (4th ed.) (discussing federal circuits in which status of waiver rule is uncertain).

But some courts and jurists have criticized this waiver rule because it "seriously limits the right of the accused to have the prosecution prove a prima facie case before he is put to his defense." *Cephus v. United States*, 324 F.2d 893, 896 (D.C. Cir. 1963), *abrogated by Foster*, 783 F.2d 1082; see also *State v. Perkins*, 271 Conn. 218, 272, 856

A.2d 917 (2004) (Katz, J., dissenting) (waiver rule cuts against well-established principle that "'[a] criminal defendant has the right to put the state to its burden and need not defend until and unless the state has presented a prima facie case'"). This critique has persuaded some states to reject the waiver rule altogether. See *In re Anthony J.*, 117 Cal. App. 4th 718, 732, 11 Cal. Rptr. 3d 865 (2004) (declining to adopt federal waiver rule because "[s]uch a rule offends the most basic premises of our criminal justice system, the presumption of innocence and the duty of the prosecution to prove guilt beyond a reasonable doubt"); *Kontos v. State*, 363 So. 2d 1025, 1034 (Ala. Crim. App. 1978) (a timely motion to exclude at the close of State's case entitles defendant to be discharged at that point, and allowing defendant to cure error in court's improper denial of the motion "would lead to the demise of the motion to exclude as a procedural corollary to the defendant's presumption of innocence and the State's burden of proof").

Here, the waiver rule adopted by our court in *Blue* would seemingly apply. After the district court denied Frantz' motion, Frantz presented evidence in her defense, and some of that evidence refuted the State's proof that Frantz was the shooter. Beauclair's testimony suggested that Patrick left work early on the day of the shooting and that he had unique knowledge of the crime scene. Frantz also presented an enhanced version of Officer Stevenson's bodycam video to support her argument that Gary had identified "my boy" as the shooter.

Even so, we need not decide the continuing validity of this waiver rule or its application here because the State failed to preserve the issue for appeal. By failing to raise or brief the waiver issue, the State has abandoned any argument related to the rule adopted in *Blue*. See *State v. Boysaw*, 309 Kan. 526, 542-43, 439 P.3d 909 (2019) (argument deemed waived, abandoned for failure to brief issue).

B.   *The District Court Properly Denied Frantz' Motion*

Turning to the merits, Frantz was charged with the first-degree premeditated murder of Gary. To secure a conviction, the State needed to prove beyond a reasonable doubt that Frantz intentionally killed Gary and the killing was done with premeditation. See K.S.A. 2016 Supp. 21-5402. The district court did not err in denying Frantz' motion for judgment of acquittal because the State presented sufficient evidence in its case-in-chief to support a prima facie case of first-degree premeditated murder.

1.   *Standard of Review and Legal Framework*

"A challenge to a denial of a motion for acquittal is, at the core, a challenge to the sufficiency of the evidence." *State v. Cottrell*, 310 Kan. 150, 163, 445 P.3d 1132 (2019). "'When examining the sufficiency of the evidence in a criminal case, the standard of review is whether, after reviewing all the evidence in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt. The appellate court does not reweigh the evidence, assess the credibility of the witnesses, or resolve conflicting evidence.'" *State v. Raskie*, 293 Kan. 906, 919-20, 269 P.3d 1268 (2012).

Moreover, appellate courts do not differentiate between circumstantial and direct evidence in terms of probative value. "'A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference.'" *State v. King*, 308 Kan. 16, 28, 417 P.3d 1073 (2018).

2. *The State Presented Sufficient Evidence During Its Case-in-Chief to Prove Frantz Was the Shooter*

The main issue at Frantz' trial was the identity of Gary's killer, and Frantz argues the State presented insufficient evidence during its case to prove beyond a reasonable doubt that she was the one who shot and killed Gary. Frantz claims the only evidence directly placing her at the scene of the shooting was Raynal's identification testimony at trial and Gary's dying declaration. Frantz essentially argues Raynal's identification is so incredible that this court should disregard it in assessing the sufficiency of the evidence. Frantz also asserts Gary's dying declaration, on its own, cannot support her conviction because it is open to interpretation.

As to the eyewitness identification evidence, Raynal was the only Stove Loft tenant who testified to seeing Frantz in the parking lot on the night of the shooting. But Raynal had originally told police she had seen a young man (not a middle-aged woman) leaving the scene. And Raynal could not identify Frantz until she saw Frantz in court at a pretrial hearing when Frantz was wearing handcuffs and a jail jumpsuit.

Given the circumstances surrounding the identification, Frantz moved to suppress Raynal's identification before trial, but the district court denied that motion. See *State v. Corbett*, 281 Kan. 294, 304-05, 130 P.3d 1179 (2006) (courts may exclude eyewitness identification if impermissibly suggestive procedure led to substantial likelihood of misidentification). On appeal, Frantz does not challenge the district court's denial of her motion or otherwise argue the district court should have excluded Raynal's testimony.

Raynal's identification certainly had its shortcomings, but this is not one of those rare cases where a witness' testimony is so incredible no reasonable fact-finder could have relied on it in reaching a guilty verdict. See *State v. Milo*, 315 Kan. 434, 450, 510 P.3d 1 (2022). Raynal explained that at the time of the shooting, she observed only the

profile of the perpetrator. And she was able to identify Frantz at the hearing because that was the first time since the shooting that she saw Frantz' profile and build. And Raynal testified the perpetrator's short hair initially led her to believe the shooter was male, and it had not occurred to her that a woman would commit such a crime. Raynal was also subjected to vigorous cross-examination, and the district court instructed the jury on factors to consider when weighing the reliability of eyewitness identification testimony. Under these circumstances, we trust juries to determine the credibility and weight of witness testimony, and we will not revisit those determinations on appeal. See *State v. Lopez*, 299 Kan. 324, 329-30, 323 P.3d 1260 (2014); *Corbett*, 281 Kan. at 306.

As to Gary's dying declaration, Frantz argues Gary's statement is open to interpretation because his first answer to Officer Stevenson's question, "Do you know who shot ya, Gary?" is unintelligible on the body camera footage. But our review of the evidence confirms a rational fact-finder could have found that Gary reliably identified Frantz as his killer in response to questioning by law enforcement. Gary's first response to Officer Stevenson's question regarding the identity of his killer is difficult to understand on video, but multiple witnesses testified to hearing Gary say his wife was the shooter when Officer Stevenson repeated his question. In the video admitted by the State, Gary also corrects other people when they misstate Frantz' name, but Gary never corrects Officer Stevenson when he asks Gary why "your wife" or "she" shot him. Several witnesses also testified to hearing Gary identify his wife as the shooter before Officer Stevenson arrived on the scene. And no witness ever testified to hearing Gary identify "my boy" or Patrick as the killer.

Moreover, while Raynal's identification and Gary's dying declaration may have been the only evidence *directly* placing Frantz at the scene of the crime, the State presented other circumstantial evidence that Frantz was the shooter. During the State's case, witnesses testified they saw a silver or light-colored two-door Hyundai leaving the scene of the shooting, and Frantz drove a silver two-door Hyundai. Police arrested Frantz

36

in this very vehicle hours after the shooting. Gary was shot with a 9-millimeter gun, and Frantz had purchased a 9-millimeter handgun a few months before the shooting. Markings on the shell casings found at the crime scene matched markings on a shell casing found in Frantz' apartment, indicating they had all been fired from the same gun. And Frantz had made several vitriolic Facebook posts about Gary, including one on the day of the shooting in which she said of Gary, "I hope you rot in hell if not I hope you rot in prison."

Frantz argues that absent Gary's dying declaration, this circumstantial evidence is insufficient to support her conviction, and thus the question before us is whether the dying declaration on its own was sufficient to support her conviction. But we need not consider the merits of this claim because parties cannot pick and choose which facts and evidence appellate courts consider when reviewing for sufficiency. Instead, appellate courts must consider *all* the evidence presented (in this instance, by the State in its case-in-chief) and construe that evidence in a light most favorable to the State. *State v. Darrow*, 304 Kan. 710, 716, 374 P.3d 673 (2016). Frantz' argument simply invites us to reweigh the evidence, which is not the proper function of a reviewing court. Viewing the evidence in a light most favorable to the State, we hold a reasonable jury could have found beyond reasonable doubt from the evidence presented during the State's case that Frantz was Gary's killer.

III. *The State Presented Sufficient Evidence to Support Frantz' Conviction for First-degree Premeditated Murder*

In her sufficiency challenge, Frantz contends the State's evidence identifying her as the shooter was further undercut by expert opinion testimony presented during the defense's case. She also contends the evidence was insufficient to prove beyond reasonable doubt that Frantz killed Gary intentionally and with premeditation. We disagree with both contentions.

A.   *Standard of Review and Relevant Legal Framework*

We review Frantz' issue under the same sufficiency of the evidence standard identified in the previous issue. The only difference is that we now consider all the evidence presented at trial—rather than limiting our inquiry to the evidence the State presented during its case-in-chief.

B.   *The Evidence Was Sufficient to Prove Frantz Was the Shooter*

As noted in the previous issue, the State presented sufficient evidence during its case to prove beyond reasonable doubt that Frantz shot and killed Gary. This evidence included Raynal's in-court identification of Frantz, Gary's dying declaration, and other circumstantial evidence suggesting Frantz was the shooter.

In the previous issue, we reviewed only the sufficiency of the evidence the State presented during its case. But in assessing the sufficiency of the evidence supporting the jury's verdict, we consider all the trial evidence. Capitalizing on this expanded evidentiary review, Frantz argues the expert opinion testimony she elicited from Johnson during the defense's case substantially undercut the reliability of Gary's dying declaration.

Johnson opined Gary was suffering from hypoxia when he made the declaration that Frantz shot him and thus there was no way to be sure he was effectively communicating at the time. Frantz argues this evidence could support an inference that Gary identified "my boy"—that is, Patrick—as the killer and Gary was merely calling out for Frantz in his dying moments.

But when reviewing for sufficiency of the evidence, appellate courts do not consider whether the evidence may be susceptible to more than one inference, or even

which inference is most compelling. Instead, appellate courts must view the evidence in the light most favorable to the State to determine if a jury could have reasonably drawn conclusions or inferences supporting the defendant's guilt. See *State v. Scaife*, 286 Kan. 614, 618, 186 P.3d 755 (2008). And as noted in the previous issue, our review of the State's evidence confirms a rational fact-finder could have found that Gary reliably identified Frantz as his killer.

Also, Johnson did not definitively say Gary did not know what he was saying or that he could not understand what was being said to him. And her opinion was refuted by the State's expert, Dr. Handler. He testified the lack of oxygen to Gary's brain would not have rendered him incoherent or unable to speak. Dr. Handler also stated there was no reason to believe Gary was incapable of saying what he wanted to say before his death. Resolving the conflict between Johnson's and Dr. Handler's expert opinion testimony in the State's favor, as we must, the evidence supports a finding that Gary understood what he was saying when he made his dying declaration.

Viewing all the evidence presented at trial in a light most favorable to the State, we hold a reasonable jury could have found beyond reasonable doubt that Frantz was Gary's killer.

C. *The State Presented Sufficient Evidence to Prove Beyond Reasonable Doubt that Frantz Killed Gary Intentionally and with Premeditation*

While the main issue at trial was the identity of Gary's killer, Frantz also argues the evidence was insufficient to support a finding that Frantz killed Gary intentionally and with premeditation. "A person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result."

39

K.S.A. 2021 Supp. 21-5202(h). And "[p]remeditation means to have thought the matter over beforehand." *State v. Kettler*, 299 Kan. 448, 466, 325 P.3d 1075 (2014).

Both intent and premeditation may be inferred from circumstantial evidence. Juries presume a person intends all the natural consequences of his or her acts. *State v. Roberts*, 314 Kan. 835, 850, 503 P.3d 227 (2022); *Kettler*, 299 Kan at 466-67. And we have identified several factors relevant to determining whether circumstantial evidence gives rise to an inference of premeditation, including: "'(1) the nature of the weapon used; (2) lack of provocation; (3) the defendant's *conduct* before and after the killing; (4) threats and declarations of the defendant before and during the occurrence; and (5) the dealing of lethal blows after the deceased was felled and rendered helpless.' [Citation omitted.]" 299 Kan. at 467.

Gary was shot six times with a gun. See *State v. Salary*, 301 Kan. 586, 601, 343 P.3d 1165 (2015) (finding defendant's use of a handgun to shoot victim multiple times supported inference of premeditation). Witnesses heard several shots, a pause, and then more shots. See *State v. Cosby*, 293 Kan. 121, 134, 262 P.3d 285 (2011) (finding evidence supporting premeditation included the defendant firing multiple shots with a pause between the first and second shot). Witnesses testified the shooter was chasing Gary while firing. See *State v. Clemons*, 273 Kan. 328, 335, 45 P.3d 384 (2002) (finding evidence sufficient to support premeditation where two witnesses testified to seeing defendant chase victim across street). Witnesses also testified the shooter immediately left the scene. See *State v. Alvidrez*, 271 Kan. 143, 149, 20 P.3d 1264 (2001) (fleeing scene of shooting without calling for or rendering aid could support inference of premeditation). When Officer Stevenson asked Gary why his wife had shot him, Gary said he did not know and they had not been fighting, suggesting a lack of provocation. See *Kettler*, 299 Kan. at 468 (while first-degree murder victim had previously robbed co-defendant, no evidence showed victim did anything on day of his murder to entice co-defendants to confront him). Frantz had posted several angry messages directed at Gary

40

on social media. And on the day of the shooting, she posted that she hoped Gary would "rot in hell" or "rot in prison." See 299 Kan. at 468 (defendant's threatening statements before shooting supported inference of premeditation). This evidence is sufficient to support the jury's finding that Frantz acted intentionally and with premeditation.

IV. *Frantz' Pro Se Claims*

In her supplemental pro se brief, Frantz raises numerous other points of error, including violations of her due process rights, insufficiency of the evidence, prosecutorial error, and a challenge to the validity of her arrest warrant.

A. *Frantz Has Failed to Establish Any Violation of Her Due Process Rights*

Frantz argues she was denied due process of law because (1) the State concealed exculpatory evidence; (2) her conviction was secured through perjured testimony; (3) her trial transcripts are inaccurate or incomplete; and (4) the district court erroneously denied her motion for judgment of acquittal. We will address these arguments in turn.

First, Frantz claims the State concealed exculpatory evidence because it did not inform the jury that Officer Stevenson misunderstood Gary's dying declaration or that Gary may have been responding to bystanders rather than Officer Stevenson's questions. Prosecutors have an affirmative duty to disclose evidence favorable to the accused, and failure to do so violates the defendant's due process rights. *State v. Breitenbach*, 313 Kan. 73, 97, 483 P.3d 448 (2021). But prosecutors do not have a duty to draw inferences from the evidence in favor of the defense and argue those inferences to the jury. Here, the State disclosed Officer Stevenson's bodycam footage to the defense, and that footage was played for the jury. Frantz was free to argue at trial that Officer Stevenson misheard Gary or that Gary was responding to other bystanders in the video.

Frantz also claims a law enforcement officer lied to conceal body camera footage of a conversation with Patrick's neighbor. See *Breitenbach*, 313 Kan. at 97 (for purposes of determining whether prosecutor withheld exculpatory evidence, law enforcement's knowledge of evidence imputed to prosecutor). But nothing in the record shows that footage of the conversation exists or that law enforcement lied to conceal its existence. In fact, the record shows Frantz knew of the conversation and its substance.

Second, Frantz asserts the State secured her conviction through perjured testimony. She claims the State manipulated one of the Stove Loft tenants into testifying that Gary identified his wife as the shooter both before and after Officer Stevenson arrived on the scene. She also alleges Raynal was manipulated into identifying Frantz as the shooter at trial.

"'A conviction obtained by the introduction of perjured testimony violates a defendant's due process rights if (1) the prosecution *knowingly* solicited the perjured testimony, or (2) the prosecution failed to correct testimony it *knew* was perjured.'" *Haddock v. State*, 282 Kan. 475, 508, 146 P.3d 187 (2006).

Frantz raised a similar claim in her motion for new trial, and the district court found Frantz had failed to establish that any witness had committed perjury. See K.S.A. 2021 Supp. 21-5903(a)(1) (defining perjury as "intentionally and falsely . . . testifying . . . to any material fact upon any oath or affirmation legally administered in any cause, matter or proceeding before any court"). Our review of the record has uncovered nothing to suggest any witness intentionally and falsely testified at Frantz' trial; thus, we affirm the district court's finding.

Third, Frantz alleges court reporters altered the trial transcripts included in the record on appeal. Criminal defendants have a due process right to reasonably accurate trial transcripts, and a defendant may be entitled to a new trial if manifestly incomplete or

42

inaccurate transcripts preclude meaningful appellate review. *State v. Holt*, 298 Kan. 531, 537, 314 P.3d 870 (2013). But when an appellant claims the denial of due process based on inaccurate or incomplete transcripts, the appellant "must make the best feasible showing possible that a complete and accurate transcript might have changed the outcome of the appeal." 298 Kan. at 538. Here, nothing in the record supports Frantz' claim that unidentified portions of the transcript have been altered or omitted. Moreover, Frantz fails to show that an accurate or complete transcript might have changed the outcome of her appeal.

Fourth, Frantz argues the district court violated her due process rights by denying her motion for judgment of acquittal at the close of the State's case because there was insufficient evidence to support her conviction for first-degree murder. As previously noted, Frantz waived any claim of error regarding the district court's denial of her motion for judgment of acquittal. See *Copes*, 244 Kan. at 610-11. Furthermore, our review of the record confirms the State presented sufficient evidence in its case in chief to support Frantz' conviction. Indeed, all the evidence discussed in our sufficiency of the evidence analysis in Issue III (other than Johnson's expert opinion testimony) was presented before the close of the State's evidence. Thus, we hold Frantz has failed to establish a violation of her due process rights.

B. *The State Presented Sufficient Evidence to Support Frantz' Conviction*

Next, Frantz argues the State failed to prove beyond a reasonable doubt that her actions were the proximate cause of Gary's death. See *State v. Wilson*, 308 Kan. 516, 522, 421 P.3d 742 (2018) ("'[U]nlawful conduct which is broken by an independent intervening cause cannot be the proximate cause of the death of another for the purpose of a conviction for homicide.'"). But Dr. Handler testified Gary died from his gunshot wounds. Dr. Handler also testified Gary had some broken ribs due to receiving CPR. He explained such injuries were common in people who had received CPR and did not

contribute to Gary's death. Thus, there is no evidence to suggest an intervening event severed the causal connection between Frantz shooting Gary and Gary dying.

Frantz also argues the State presented insufficient evidence to prove she acted with the mens rea, or culpable mental state, for first-degree premeditated murder. As discussed in Issue III, we hold the State fulfilled its burden to prove this element beyond a reasonable doubt.

### C.   *The State Did Not Commit Reversible Prosecutorial Error*

Frantz argues the prosecutor committed prosecutorial error by stating facts not in evidence during closing argument. The prosecutor stated once during closing that Frantz "waited in [Gary's] parking lot." Frantz asserts there is no evidence to show she waited in the parking lot.

When reviewing claims of prosecutorial error, we use a two-step process. *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016). First, we must determine if error occurred—whether the acts complained of fall outside the wide latitude afforded to prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. 305 Kan. at 109. If we find error has occurred, we must then determine whether the error prejudiced the defendant's due process rights to a fair trial. In conducting that analysis, we determine whether the State can demonstrate there is no reasonable possibility that the error contributed to the verdict. 305 Kan. at 109.

We find the prosecutor's comment falls within the wide latitude afforded prosecutors in arguing their case. While no evidence directly shines light on when Frantz arrived at Gary's apartment, it was reasonable to argue from the evidence that she waited for him in the parking lot. Frantz apparently had to drive at least 20 minutes to arrive at

Gary's apartment in Leavenworth, and she and Gary were not on good terms, so it seems reasonable to infer from this evidence Frantz was unlikely to have known his whereabouts. See *State v. Longoria*, 301 Kan. 489, 524, 343 P.3d 1128 (2015) (prosecutor has wide latitude in crafting arguments and drawing reasonable inferences from evidence). The challenged statement falls within the wide latitude afforded to prosecutors in arguing the case.

D.   *Frantz Did Not Preserve Her Challenge to Her Arrest Warrant for Review*

Frantz claims her arrest warrant is "illegal" because the supporting affidavit omitted information. The affidavit states, "Barbara has told her son, Patrick Frantz, she wanted Gary, 'to get what he deserves.'" And Patrick told law enforcement that Frantz had texted him saying Gary "was gonna get what's coming to him through her turning in his phone." Frantz now claims the affidavit omitted that she believed Gary had child pornography on his phone, and she wanted to turn in his phone so he would go to prison for possessing child pornography.

If law enforcement deliberately omitted information from the affidavit supporting Frantz' arrest warrant, that omission may violate Frantz' Fourth Amendment rights if the missing information would have negated a probable cause finding. See *United States v. Banks*, 884 F.3d 998, 1009 (10th Cir. 2018). But parties generally may not raise constitutional claims for the first time on appeal. *State v. Daniel*, 307 Kan. 428, 430, 410 P.3d 877 (2018). Frantz does not cite to any point in the record where she raised this issue before the district court. See Kansas Supreme Court Rule 6.02(a)(5) (2020 Kan. S. Ct. R. 34) (requiring appellant to include a pinpoint reference to the location in record where issue was raised and ruled on). Nor has she briefed why we should consider her claim despite her failure to raise it below. See *Daniel*, 307 Kan. at 430 (although there are exceptions to general rule that constitutional issue cannot be raised for first time on appeal, litigant must assert the exceptions); Supreme Court Rule 6.02(a)(5).

45

Even so, Frantz' challenge to the affidavit fails under the record before us. Even assuming the omission of the information was deliberate, Frantz would only be entitled to relief if she can show the inclusion of the omitted information negated probable cause. *State v. Breazeale*, 238 Kan. 714, 725, 714 P.2d 1356 (1986). But our review of the affidavit shows that even with the addition of the omitted information, the affidavit still establishes probable cause to arrest Frantz for first-degree premeditated murder. The affidavit states: (1) Frantz and Gary were having marital problems; (2) Frantz believed Gary was poisoning her and she expressed a desire to get revenge by getting him sent to prison; (3) Frantz had recently purchased a handgun; (4) Frantz was acting strangely shortly before the shooting; (5) Gary was shot multiple times with a handgun; and (6) Gary said Frantz shot him. The totality of this information, as well as reasonable inferences drawn from this information, would support a reasonable belief that Frantz committed the first-degree premeditated murder of Gary. See *Rosendahl v. Kansas Dept. of Revenue*, 310 Kan. 474, 481, 447 P.3d 347 (2019) (defining probable cause as "'the reasonable belief, drawn from the totality of information and reasonable inferences available to the arresting officer, that the defendant has committed or is committing a specific crime'").

E.  *We Decline Frantz' Request to Take Judicial Notice of Certain Documents and Information and Her Request to Add an Exhibit to the Record*

Frantz asks this court to take judicial notice of several documents and pieces of information, including two witness statements given to police on the night of the shooting; a complaint she filed with the State Board of Examiners of Court Reporters alleging court reporters had altered transcripts; and several other allegations of professional misconduct. But none of these items are subject to judicial notice under K.S.A. 60-460.

46

Frantz also asks this court to independently request a copy of Officer Stevenson's body camera footage to determine if the State has altered the video provided on appeal. But Frantz has the burden to designate a record sufficient to establish error on appeal (including her claim that the State has altered evidence), and she has not done so. *Vonachen*, 312 Kan. at 460.

CONCLUSION

In sum, we hold the district court did not abuse its discretion or violate Frantz' Confrontation Clause rights by limiting her cross-examination of Patrick. The district court imposed those limits to prevent Frantz from adducing evidence which was inadmissible under established evidentiary rules. And the district court's limitations did not prevent Frantz from otherwise effectively cross-examining Patrick. We also hold that Frantz waived any challenge to the district court's denial of her motion for judgment of acquittal at the close of the State's evidence. And the State presented sufficient evidence to support Frantz' conviction for first-degree premeditated murder. Finally, we hold Frantz' supplemental briefing failed to establish any other error requiring reversal.

Affirmed.

* * *

STEGALL, J., concurring: I concur in the result, but I do so only after considering and rejecting the waiver rule from *State v. Blue*, 225 Kan. 576, 578, 592 P.2d 897 (1979). The majority recognizes that this rule precludes appellate review of a trial court decision to deny a motion for acquittal at the close of the State's case-in-chief if the defendant proceeds to put on evidence in his or her own defense. Often referred to as a "waiver," the rule is premised on the idea that on a subsequent motion for acquittal—or on appellate review—all the evidence against the defendant ought to be considered. See, e.g., *State v.*

47

*Copes*, 244 Kan. 604, 607, 772 P.2d 742 (1989) ("If the motion for acquittal is renewed after the close of all of the evidence, the trial court should consider *all* of the evidence in ruling upon that motion."). The majority provides a helpful string cite to numerous other jurisdictions that have adopted the same rule. *State v. Frantz*, 316 Kan. ___, ___, slip op. at 31-32; see, e.g., *State v. Seeley*, 326 Conn. 65, 71, 161 A.3d 1278 (2017) ("'The so-called waiver rule provides that, when a motion for [a judgment of] acquittal at the close of the state's case is denied, a defendant may not secure appellate review of the trial court's ruling without [forgoing] the right to put on evidence in his or her own behalf.'").

The majority concedes the *Blue* waiver rule would typically apply here to preclude appellate review of the district court's decision to deny Frantz' motion for acquittal at the conclusion of the State's evidence. But due to a lack of briefing by the State, the majority reaches the merits on the issue anyway. *Frantz*, 316 Kan. at ___, slip op. at 33.

More often than not, when an issue is not properly preserved for appellate review, we will not decide it. This is often true even when the parties don't specifically raise the issue of preservation. See *State v. Parry*, 305 Kan. 1189, 1192, 390 P.3d 879 (2017) (an appellate court has discretion to sua sponte reach a preservation issue not raised by either party). I would prefer to stick with our general practice and consider preservation issues even when not argued by the parties. If an issue is not properly preserved, it is not properly before us absent a preservation exception. And mutual agreement of the parties to present an unpreserved issue to this court is not—in itself—a recognized exception to our preservation requirements. *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015) (Exceptions to our general bar against unpreserved claims are: "'(1) The newly asserted claim involves only a question of law arising on proved or admitted facts and is determinative of the case; (2) consideration of the claim is necessary to serve the ends of justice or to prevent the denial of fundamental rights; or (3) the district court is right for the wrong reason.'").

48

Given this, I will consider the application of the *Blue* waiver rule in this case. And it isn't difficult to conclude the rule ought to be discarded. As the majority recites, there are simple fairness problems with the rule. *Frantz*, 316 Kan. at ___, slip op. at 32-33. For example, some courts have found the rule "presents a defendant whose motion to dismiss has been erroneously denied with a Hobson's choice:  resting and sacrificing the right to present a defense out of fear that his or her testimony may cure defects in the prosecution's case, or putting on such evidence and thereby possibly assisting the prosecution in proving its case." *In re Anthony J.*, 117 Cal. App. 4th 718, 732, 11 Cal. Rptr. 3d 865 (2004).

But even more basic, the rule violates one of the most sacrosanct principles of American criminal law—the prohibition against being put in jeopardy twice for the same accusation. See, e.g., *Benton v. Maryland*, 395 U.S. 784, 796, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969) ("Like the right to trial by jury, [the prohibition on double jeopardy] is clearly 'fundamental to the American scheme of justice.'"); *Green v. United States*, 355 U.S. 184, 187-88, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957) ("The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty."); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S. Ct. 1349, 51 L. Ed. 2d 642 (1977) ("[A]lthough the Court of Appeals may correctly have believed 'that the acquittal was based upon an egregiously erroneous foundation, . . . [n]evertheless, "[t]he verdict of acquittal was final, and could not be reviewed . . . without putting [the defendants] twice in jeopardy, and thereby violating the Constitution."'"); *Green*, 355 U.S. at 200 (Frankfurter, J., dissenting) (describing the prohibition of double jeopardy as an "indispensable requirement of a civilized criminal procedure"); *Ex parte*

*Lange*, 85 U.S. (18 Wall.) 163, 168, 21 L. Ed. 872 (1873) ("If there is anything settled in the jurisprudence of England and America, it is that no man can be twice lawfully punished for the same offence.").

Simply put, the government doesn't get two bites at the conviction apple. But this is exactly what the *Blue* rule allows. To make the point clear, consider what happens when a trial court does grant a motion to acquit following the State's evidence.

> "A judgment of acquittal . . . terminates the prosecution; and the double jeopardy clause of the fifth amendment bars further proceedings against the defendant for the same offense. If the trial court grants a motion for acquittal . . . the order is final and not appealable by the state. Appellate review of the decision after acquittal would constitute double jeopardy. [Citations omitted.]" *State v. Gustin*, 212 Kan. 475, 479-80, 510 P.2d 1290 (1973).

> "[A]n acquittal through a directed verdict is immediate, is accorded finality, and renders the question of guilt no longer at issue. The defendant then stands acquitted of the offense to which the motion is directed and the grant has the same force and effect as the return of a verdict of not guilty by the trier of fact, whether it is the court or a jury." 75A Am. Jur. 2d Trial § 851.

This is as it must be because the "'constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal.'" *United States v. DiFrancesco*, 449 U.S. 117, 129, 101 S. Ct. 426, 66 L. Ed. 2d 328 (1980); see also K.S.A. 2021 Supp. 21-5110(a)(1) (additional prosecution "is barred" following "a determination that the evidence was insufficient to warrant a conviction").

So, in a hypothetical case in which the State fails to present sufficient evidence for a conviction, and the trial court correctly grants a motion for judgment of acquittal at the close of the State's evidence, the defendant may no longer be prosecuted for that alleged offense. But—according to the *Blue* waiver rule—if the trial court commits legal error

50

and denies the same motion, the State is free to get its second bite during the defendant's presentation of evidence and the defendant is prevented from seeking appellate review of the error. In my view, the application of this rule turns a blind judicial eye to potential double jeopardy violations of both the United States and Kansas Constitutions.

A defendant who was legally entitled to an acquittal—even if he or she did not obtain that acquittal at the time it was asked for through the legal error of a judge—must have the same double jeopardy protections afforded an identical defendant who in fact did obtain a legally correct judgment of acquittal. To vindicate this double jeopardy right, an appellate court has an obligation to consider whether the motion for acquittal at the close of the State's case was denied in error. If it was, then everything that happened afterward—even if sufficient evidence was later presented—must nonetheless be disregarded as a violation of double jeopardy principles.

Given this, I would use today's opportunity to abrogate the *Blue* waiver rule and reach the merits of the properly preserved question presented by Frantz—did the district court err when it denied Frantz' motion for acquittal after the State's case-in-chief? Because I agree with the way the majority opinion analyzes this question, I concur in the judgment.

LUCKERT, C.J., and ROSEN, J., join the foregoing concurring opinion.