NOT DESIGNATED FOR PUBLICATION

No. 125,031

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

MICHAEL ANTHONY SEARS SR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Riley District Court; KENDRA LEWISON, judge. Submitted without oral argument. Opinion filed March 22, 2024. Affirmed.

*Kai Tate Mann*, of Kansas Appellate Defender Office, for appellant.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, C.J., ATCHESON, J., and TIMOTHY G. LAHEY, S.J.

ARNOLD-BURGER, C.J.: Michael Anthony Sears Sr. was charged and convicted of rape, attempted rape, and four counts of aggravated indecent liberties with a child for incidents involving two young girls. At the trial on the charges, the jury heard that Sears' daughter, A.S., recanted her allegations against Sears while her friend, C.B., did not. The jury found Sears guilty of all charges. The district court denied Sears' motion for departure and sentenced him under the Jessica's Law sentencing scheme. The court also ordered Sears to register as a sex offender under the Kansas Offender Registration Act. Finding no reversible error in the issues raised on appeal, we affirm.

1

FACTUAL AND PROCEDURAL HISTORY

Because sufficiency of the evidence is central to several of Sears' claims, we will begin by giving a detailed recitation of the facts as revealed at various stages of this proceeding, beginning with a conversation between a 12-year-old girl and her mother.

In April 2018, A.S., who was younger than 14 years old at the time, told her mother (Mother) that she had seen a video of a father raping his daughter and asked what Mother would do if somebody did something like that to her. Mother responded that she would hunt the person down and there would be no place for them to hide. Mother asked A.S. if something like that had happened to her or her brother and A.S. started crying and said that Sears had done that to her. A.S. told Mother that Sears touched her on multiple occasions while Mother and A.S.'s brother (Brother) were at Boy Scout meetings. According to A.S., Sears would have her pull down her pants and underwear and try to touch her, attempt to insert his fingers into her, and did put his fingers inside her on a couple of occasions.

Mother immediately took A.S. to the police station after talking to her friend B.B., whose daughter, C.B., was a close friend to A.S. Mother told Officer Eric Beaubien what A.S. told her and then A.S. provided more details. The interview was videotaped, and a redacted version was shown to the jury.

In the redacted interview, A.S. stated that the abuse started in early 2017 when she and Sears were in their garage and A.S. complained about some itching and stinging in her vagina. Sears told A.S. to let him look. He looked at it and told her to pull up her pants. Over the next few days, Sears checked A.S.'s vagina, rubbed it, and went further down each time. On a couple of occasions, he tried to put his finger in her "hole," but she grabbed his hand because it would sting and made her cry. Sears usually used his finger, but on one occasion he used a paper towel. He would have her sit on his lap on a chair in

2

the game room when he did this. A.S. said that on one occasion, while she was in fifth grade, Sears put his finger inside her up to his "first knuckle" which caused her to scream so he stopped. A.S. also said that Sears had "tried to go deeper" after the "first knuckle" incident, but he stopped after she screamed in pain. He would tell her to "shhh." Sears told her that if she told anyone he would "make it a lot worse for me." She said it happened every time her mom was taking Brother to Boy Scouts. A.S. said she tried to get out of the house to avoid him. After each time Sears asked A.S. if she liked it, and she told him she did not and tried to pull away. A.S. said that Sears told her that if she "fingered" herself that it would "break a wall," so that it would not hurt and would feel better when he did it. According to A.S.'s interview, Sears tried to stick his finger into her vagina around five times. The last time occurred sometime in January 2018.

During the interview, B.B. texted Mother and said that her daughter, C.B., could corroborate A.S.'s story because A.S. had told her about it, but not in great detail. After receiving the call from Mother, B.B. asked C.B. if Sears had done anything to her—because C.B. frequently visited the Sears' residence. C.B. started crying and nodding her head. So B.B. took C.B. to the police station the same evening.

When B.B. texted Mother that they were on their way to the police station based on C.B.'s corroboration of A.S.'s allegations, Mother told A.S. that C.B. said A.S. had told her about it but she didn't know details. Mother then took over the questioning of A.S. and asked her what she had told C.B., becoming a bit aggressive in questioning A.S., becoming openly critical when she told the officer C.B.'s middle name—saying he did not need to know that. A.S. apologized and then proceeded to tell how C.B. came to know what happened.

A.S. told Mother and Officer Beaubien that C.B. had been spending the night on an evening when just Sears was home. She relayed that Sears had been mixing Pepsi with alcohol and told them it was "children appropriate." He made them drink it. They then

3

went back to Sears' bedroom to watch television because A.S. did not have Netflix on her television. Mother interrupted and said, "[C.B.] is saying she knows something happened with Daddy, but she doesn't know what." A.S. responded that he "tried to do it to [C.B.]." Mother again interrupted, "that is not what she said." And A.S. responded, "but he did."

Mother started texting on her phone, and Officer Beaubien resumed questioning and asked A.S. to describe what happened. A.S. described Sears putting his hands down her pants and her squirming to get away from Sears' touching and getting up to go to the bathroom. When she came back, she and C.B. went to her room and C.B. told her that Sears had tried to put his hands down her pants. A.S. told C.B. that Sears had done that to her. C.B. advised A.S. that she should tell an adult. A.S. told C.B. she was too nervous to "because I didn't want Mom and Dad's relationships to end," and she was "too scared what he would do to me."

Mother asked if Sears actually did something to C.B., and A.S. responded that she did not know if he did or just tried to. Mother pointed out that C.B. was claiming she did not know any details and A.S. repeated that she told C.B. what happened. Mother speculated that C.B. may just be afraid to say something, just like A.S. was afraid to come forward.

The recorded interview with A.S. also included discussions between A.S. and Mother—after Officer Beaubien stepped out of the interview room—where A.S. indicated that she was scared that Mother would not believe her and was worried that Mother would be mad at her. Mother advised A.S. that she was upset that this had happened and that she had not told her about it. She was also upset that Sears tried to do something to C.B. She also said she hoped A.S. was telling the truth and not lying. A.S. responded, "I am not lying, mommy." The following discussion took place between A.S. and Mother, while Officer Beaubien was absent from the room:

4

Mother: "I hope you are not just saying this to start trouble or just because you watched on a tv show or a movie or because it happened to some of your friends."

A.S.: "No, I am not."

Mother: "Because you know your dad is going to get arrested."

A.S.: "Yes, I know. I am not lying."

Mother (whispering): "And if he gets arrested, he is going to go to jail."

A.S. (looking surprised): "To jail?"

Mother: "Yes, he molested you."

A.S.: "How long is that for?"

Mother: "For however long. So your dad's life is over right now. They're going to investigate this, the detectives are going to come investigate it, they're going to get him, they're going to ask him questions, and if they can find him guilty, he's going to jail."

A.S.: "What if they don't?"

Mother: "Why would they not find him guilty, are you lying about something?"

A.S.: "No I am not lying mommy, why would I be lying if daddy is going to go to jail?"

Mother: "I am just asking and I'm trying to figure out you are now telling me this and it has supposedly been going on for a year. It went on for a year and you never said anything."

A.S.: "Because I was scared what he was going to do to me. I didn't know what he was going to do to me."

Mother: "All those times you were laying on your dad, loving on your dad, hugging up on your dad, what was that all about? What was that for?"

A.S.: "Because I still loved him."

Mother: "Oh, really? And when he deployed and stuff like that you were crying and sobbing your eyes out, acting all dramatic and stuff like that but he's been sexually assaulted you, molesting you, right? If that's what happens, it happened. I believe you.

A.S. (slaps hand on lap angerly): "No, no you don't."

Mother: "Yes, yes I do."

A.S. (curling up on the chair, crying): "No, you don't."

(unintelligible)

Mother: "[A.S.] I believe you."

A.S.: "No, you don't."

5

Mother: "[A.S.] I believe you. If I didn't believe you, I wouldn't have brought you here. I wouldn't have called [B.B.], but I just want to make sure you are fully aware that if all of this stuff is what happened, that's it."

A.S. (crying): "It did happen. I am not making this up."

Mother: "Well, ok, ok. That's it. You will never be able to see your dad again. You know that right?"

A.S.: "Yes."

Mother: "[A.S.] put your legs down, it's fucking stop. Stop with the bullshit. Ok. Just stop, just stop. Put your feet down and stop. Please do us all a favor."

A.S.: (Sits up straight.)

Mother: "It happened. If I didn't believe you, I wouldn't have brought you here. . . . I just want to make sure you are fully aware of what is about to happen. That they may take you and your brother from me, I just want you to know that."

A.S.: "Why you?"

Mother: "They are probably going to make you go through testing and they are probably going to find out if you are telling the truth and they will do the same thing to your dad. So I hope for your sake that you are telling the . . . I believe you, I'm just saying you better be telling the truth and the whole truth and if you don't it will come out. It will come out so you better, you need to make sure you're telling them everything they need to know and telling the whole truth that's all I'm going to say. I believe you. If I didn't believe you, you think I would bring you here?"

A.S.: "No."

Mother: "Do you think I would have called [B.B.] and drag [her] through all this?"

A.S.: "No."

Mother: "So trust me, I believe you I am just telling you make sure you understand the severity of the situation because as of right now, it's done. It's done. Me and your dad are over. There is no going back. There's no fixing that. It's over."

A.S.: "Where are we going to live?"

Mother: "We will figure it out. I promise, we are going to figure it out. But he is not going to be allowed to see you guys unless it's supervised, somebody from the court watching you and even then, I don't know. . . . If he's found guilty of child molestation he's going to go to jail."

A.S.: "Does that mean grandma and grandpa are going to hate me?"

6

Mother (shrugging shoulders): "I don't know. I already texted grandma and told her what was going on."

A.S.: "What does she say?"

Mother: "She doesn't know what to think."

A.S.: "Nobody believes me besides you."

Mother: "She just doesn't know. . . ."

A.S.: "No I'm just saying nobody believes me except you two."

Mother: ". . . [B.B.] says [Brother] is crying because he thinks it is his fault it happened while we were at Boy Scout stuff."

A.S. (breaks down crying): "It is not his fault."

Mother: "I know."

At this point, Officer Beaubien stepped back in and asked if Sears is A.S.'s biological father, and Mother responded, "No, he is her adopted father he adopted her when she was born." A.S. still crying said, "Tell [Brother] it is not his fault." Mother responded, "I will."

C.B. was interviewed twice, and both interviews were recorded and played for the jury. C.B.'s statements were consistent with what A.S. told police that first night. According to C.B., the incident occurred during the weekend of "Og Fest." C.B. was at A.S.'s house with A.S. and Sears while Mother and Brother were at a Boy Scout camp. Sears was drinking a variety of alcohol including Jack Daniels. He offered the girls alcohol. C.B. took a sip and gagged recognizing it to be alcohol. Every time he poured a drink for himself, he asked the girls if they wanted one. C.B. thought he was acting different than normal. While they were playing games in the game room, Sears pulled C.B. onto his lap, even though she protested saying she was fine on the couch. He kept bouncing her on his knee.

Later they went to Sears' bedroom to watch television. According to C.B., the three of them were watching television on Sears' bed when A.S. got up to go to the bathroom. When A.S. got up, C.B. mouthed to her "Why?" A.S. mouthed back "I'll tell

7

you later." At that point, Sears rolled over and started using both hands to touch C.B.'s "lower private parts" under her clothes while A.S. was in the bathroom. He was "spooning" her from behind while she was lying on her side. C.B. then clarified that Sears' hands were rubbing her under her clothing, near her vagina, touching skin. C.B. testified that Sears put his hands down her pants and underwear and was touching where her pubic hair grew and around her clitoris but not actually in her vagina. This took place for about three minutes. C.B. attempted to get away but was unable to do so. She yelled for A.S. and as A.S. returned from the bathroom, Sears stopped. At that point A.S. started jumping on the bed and trying to pull C.B. off the bed. Sears told the girls that they could just sleep in his bed. When C.B. and A.S. attempted to leave, Sears lifted C.B.'s shirt and blew "raspberries" on her stomach, which made her laugh because it tickled but made her uncomfortable.

The girls left the room and went to A.S.'s bedroom where C.B. told A.S. what happened. A.S. said the same thing happened to her which is why she left to go to the bathroom. Sears then walked into the bedroom and said that he heard what they said. A.S. started crying and told C.B. not to tell anyone because she did not want Sears to get in trouble. Sears apologized and said he sometimes gets "'handsy'" when he has had alcohol. He also advised C.B. that she did not have to come over anymore if she didn't want to, but to please not tell anyone. So she did not tell anyone.

After Sears left, A.S. continued to cry and ask C.B. not to tell anyone because she did not want to get in trouble. The next morning C.B. wanted to talk about it but A.S. did not. By this time A.S.'s mother was home and she said she didn't want to talk about it in front of her mom. C.B. continued to frequent A.S.'s house after the incident occurred and did not indicate any hesitancy in going there. But neither girl spoke of the incident again until A.S. told her mother in April 2018.

Just a few days later, A.S. recanted her allegations. From that point and through both the preliminary hearing and trial A.S. testified that any information she gave to Beaubien about Sears touching her inappropriately was false. A.S. testified that she lied about Sears inappropriately touching her because she saw Mother with a different man while Sears was out of town for work and that she thought by making the accusations Sears would come back to town and things would be better. But it soon became clear that A.S. did not see Mother with another man until 2019, well after making the claims of abuse.

Contrary to A.S.'s recantation, C.B.'s story remained consistent from her first interview with police through the preliminary hearing and trial.

Both girls later interacted with Detective Jessie Ehrlich. Ehrlich interviewed A.S. in mid-May 2018. A.S.'s mother refused to allow the interview to be recorded. A.S. told Ehrlich that she lied to Beaubien in the recorded interview because she wanted Sears to come home. A.S. also told Ehrlich that her mother told her that Sears was going to get in trouble based on her allegations and that her mother also bribed her to come and talk to Ehrlich. Near the end of her interview, A.S. told Ehrlich that it was just easier to say that the inappropriate touching did not happen.

Ehrlich also recorded her interview with C.B., which was consistent with what she said in her interview with Beaubien. All the recorded interviews were admitted at trial, as well as live testimony from both A.S. and C.B., the officers who interviewed them, and Mother and B.B. Both A.S. and Mother remembered little about what was said to police while being recorded and proved to be somewhat hostile and uncooperative witnesses during trial.

The State rested its case and Sears moved for judgment of acquittal on count 6, which was aggravated indecent liberties with a child, C.B. In response, the State argued

9

that C.B. "said that [Sears] touched her where her pubic hair, where her clitoris, her clit is, which [the State thought] common verbiage would indicate that's the clitoris." The State continued by arguing that it was up to the jury to determine if that qualified as lewd fondling, which was an element of the charge against Sears. The trial court agreed and denied Sears' motion.

Sears presented his own witnesses in his defense, beginning with Dr. Robert Barnett, a clinical psychologist. Barnett's testimony largely focused about interview methods. Barnett testified that he reviewed the videotaped interview between Ehrlich and C.B. Barnett testified that he saw problematic interview techniques used by Ehrlich, specifically he pointed out that she used leading and suggestive questions and that there was a lack of assessment for alternative hypotheses.

Sears also called Rhea Barrett, A.S.'s therapist. Barrett testified that A.S. told her that she missed Sears while he was deployed for work. Barrett also testified that she did not show any indications of sexual abuse and that any abuse that led to this case was not discussed in therapy.

Dr. Gregory Nawalanic, a clinical psychologist, also testified on Sears' behalf. Nawalanic conducted a *Gregg* evaluation on A.S. Nawalanic testified that during the evaluation, A.S. told him that she made the allegations because her mother had cheated on Sears while Sears was away from home in the past and she thought making the allegations was the only way she could keep her family together. According to Nawalanic, A.S. thought the allegations would not have a significant impact on Sears and that at most he would get something akin to probation. Nawalanic also testified that A.S. was upset that C.B. did not recant her allegations against Sears.

Finally, Sears testified in his own defense. Sears generally denied all the allegations against him. He testified that C.B. was at their home often, to the point they

10

joked that if she was going to be there so much, they should just adopt her. He treated her as a second daughter. He also testified that he rarely drank alcohol, and then usually drank beer.

The jury found Sears guilty on all charges. Prior to sentencing, Sears moved for a departure to the grid and a further departure from the presumptive sentence. Sears argued that a departure was appropriate because: He had no criminal history, the degree of harm was less than typical in similar cases given that one of the victims had recanted her allegations and the other continued to spend time at Sears' home after the alleged abuse occurred, he had a successful career in the military, and he was a low risk for causing further harm to the community.

The district court denied Sears' motion for departure and sentenced him to six concurrent life sentences, without the possibility of parole for 25 years. The court also ordered Sears to register as a sex offender for life. Sears appeals his convictions and sentence.

ANALYSIS

I. THERE WAS SUFFICIENT EVIDENCE TO SUPPORT THE CONVICTIONS AGAINST SEARS

A. *We review the evidence in the light most favorable to the State.*

"'When the sufficiency of the evidence is challenged in a criminal case, we review the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. An appellate court does not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses.' [Citations omitted.]" *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021).

11

B. *After reviewing the evidence, we find the evidence was sufficient to support the convictions.*

Sears argues there was insufficient evidence to support his convictions for crimes against A.S. and C.B. He argues that A.S. recanted her allegations against him and only made the allegations because she did not want him leaving the house for an extended period for work. He also argues that there was insufficient evidence to support the convictions involving C.B. He argues that while C.B. testified that Sears touched her "'spot'" it was not clear what the "'spot'" was. This coupled with the testimony that Sears was blowing raspberries on her stomach meant there was insufficient evidence to show that Sears engaged in "lewd fondling . . . with the intent to arouse or satisfy the sexual desires of either the child" or himself as required by K.S.A. 21-5506(b)(2)(A).

Sears' argument is unpersuasive. When viewed in a light most favorable to the State, there was sufficient evidence to support Sears' convictions. Evidence presented at trial by the State established that Sears inserted his finger inside A.S.'s vagina, attempted to insert his finger inside A.S.'s vagina, touched A.S. inappropriately on three separate occasions, and that he "spoon[ed]" C.B. and put both of his hands underneath her underwear and touched her pubic region and around her clitoris. Sears asks this court to reweigh the evidence presented at trial, which this court cannot do. See *Aguirre*, 313 Kan. at 209. The jury heard the testimony and evidence presented by both parties and determined that Sears was guilty of the crimes charged. The record on appeal shows that there was sufficient evidence to support those convictions.

II.     SEARS WAIVED ANY ALLEGED ERROR FOR DENIAL OF HIS MOTION FOR JUDGMENT OF ACQUITTAL AT THE CLOSE OF THE STATE'S CASE

Sears argues that the district court erred in denying his motion for judgment of acquittal of the charges related to C.B. But based on existing Kansas caselaw, we must find that he waived any error through his actions at trial.

12

The Kansas Supreme Court has long held that "when a defendant unsuccessfully moves for judgment of acquittal at the close of the State's evidence and then proceeds to present evidence, the defendant waives any error in denial of the motion." *State v. Frantz*, 316 Kan. 708, 732, 521 P.3d 1113 (2022) (citing *State v. Blue*, 225 Kan. 576, 578, 592 P.2d 897 [1979]). The rule was later modified to allow the defendant to present rebuttal evidence so long as it was confined to the substance and credibility of the witnesses for the State or a codefendant and does not try to refute any elements of proof adduced in the State's case. *Frantz*, 316 Kan. at 733.

Sears acknowledges the holding in *Blue* and recognizes that this court is duty bound to follow Kansas Supreme Court precedent, absent some indication that the Kansas Supreme Court is departing from its earlier ruling. *State v. Beck*, 32 Kan. App. 2d 784, 788, 88 P.3d 1233 (2004). However, Sears argues that the Kansas Supreme Court indicated in *Frantz* that it might be departing from the holding in *Blue*.

Sears points to the Kansas Supreme Court's acknowledgment that some courts have criticized the waiver rule because it limits a defendant's rights to have the prosecution prove a prima facie case. *Frantz*, 316 Kan. at 735. He also points to the concurring opinion in *Frantz*, where three justices noted that they would have abrogated the waiver rule. 316 Kan. at 751 (Stegall, J., concurring).

While there are indications that portions of the Kansas Supreme Court would abrogate the waiver rule, that is not the same as indications that the entirety of the court is making those same indications. For now, even if this court agrees that continued reliance on *Blue* should be reexamined, we remain duty bound to follow Kansas Supreme Court precedent. The Kansas Supreme Court has continued to hold that a defendant waives any potential error in the denial of a motion for acquittal by presenting evidence, other than certain rebuttal evidence, after the State rests its case. *Frantz*, 316 Kan. at 732; see *Beck*, 32 Kan. App. 2d at 788.

13

But even if we assume the Supreme Court has signaled its dissatisfaction with *Blue* and we agreed *Blue* should be reversed, the district court did not err in denying the motion. As outlined above, the evidence as presented during the State's evidence-in-chief was sufficient to present the issue to the jury.

III.     THE DISTRICT COURT DID NOT ERR BY ADMITTING CUMULATIVE EVIDENCE
          REGARDING THE ALLEGATIONS AGAINST SEARS

For his next argument on appeal, Sears contends that the district court abused its discretion by admitting the video interviews of A.S. and C.B. with Beaubien.

A.  *We review whether the court abused its discretion.*

Appellate courts review the question of whether evidence was cumulative for an abuse of discretion. *State v. Rodriguez*, 295 Kan. 1146, 1156, 289 P.3d 85 (2012). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Bilbrey*, 317 Kan. 57, 63, 523 P.3d 1078 (2023).

B.  *The evidence presented was not unduly cumulative.*

This court has noted that repetition of certain evidence is "characteristic in the prosecution of child sex crimes and generally draws no objection." *State v. Kackley*, 32 Kan. App. 2d 927, 934-35, 92 P.3d 1128 (2004). But we have also acknowledged that "Kansas has embraced the general rule that prior statements of a witness, consistent with his or her own testimony at the trial, are not admissible in corroboration of the witness' testimony unless the witness has been impeached and then only for the purpose of rehabilitation." 32 Kan. App. 2d at 935.

14

An exception to the general rule applies where the defendant is charged with rape. There, evidence of the complaint of the victim "is permitted for the express purpose of corroborating [the victim's] testimony through the testimony of other witnesses." 32 Kan. App. 2d at 935 (citing *State v. Washington*, 226 Kan. 768, 770, 602 P.2d 1377 [1979]). This court extended the exception to prosecutions for sexual abuse of children in *Kackley*. 32 Kan. App. 2d at 935.

Moreover, while the general rule is that there should not be cumulative evidence, the decision to limit the number of witnesses on a single issue lies within the authority of the trial court. 32 Kan. App. 2d at 935. As Sears acknowledges in his brief, the Kansas Supreme Court has previously found that the trial court did not err by allowing two witnesses for the State to give cumulative testimony on the same issue. *State v. Johnson*, 231 Kan. 151, 156-57, 643 P.2d 146 (1982).

Sears argues that allowing the State to present the police interview videos was unduly cumulative because C.B.'s and A.S.'s mothers testified about their daughters' disclosures to them, in addition to C.B.'s and A.S.'s own testimony at trial. As Sears puts it, "[t]here was no additional relevance added by the videos."

That said, during his opening statement at trial, Sears discussed how A.S. recanted her allegations soon after making them. Sears also attacked C.B.'s credibility, pointing out that her allegation changed over time and how it was influenced by interview techniques used by the police.

Under the circumstances, the district court did not abuse its discretion by admitting Beaubien's interviews of A.S. and C.B. Sears' defense relied largely on the fact that A.S. recanted her allegations shortly after making them. Playing her interview with Beaubien would allow the jury to see A.S.'s demeanor during the initial interview where the allegations were made.

15

Similar considerations apply for C.B.'s interview. While C.B. did not recant her allegations, Sears spent a large part of his case attempting to undermine her credibility. He also called Barnett, who testified about problematic interview techniques. By admitting C.B.'s interview, the jury was able to examine the interview themselves and could better determine the credibility of C.B.

While the general rule is to limit repetitive evidence at trial, the standard of review for this court is whether the district court abused its discretion by allowing additional evidence. *Rodriguez*, 295 Kan. at 1156. Sears fails to show that the district court's decision to admit the video interviews at trial was an abuse of discretion under the circumstances.

IV.   THE STATE DID NOT COMMIT PROSECUTORIAL ERROR

Sears argues that the State committed prosecutorial error by arguing facts not in evidence or by misstating evidence during cross-examination.

A.  *We use a two-step process to evaluate claims of prosecutorial error.*

Appellate courts use a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022).

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is

16

harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, i.e., where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

B. *The prosecutor did not misstate the evidence in closing.*

i. *Evidence about Sears' touching of C.B.*

First, Sears contends that the State committed error by telling the jury during closing arguments that C.B. testified that Sears touched her clitoris when her testimony was clear that Sears did not touch her clitoris. To be more specific, the complained of statement was: "Do you believe that [C.B.] was touched by Mr. Sears? Remember what [C.B.] said regarding the incident. She said that he had his hand down her pants, that it was on her pubic hair, on her clitoris." Sears objected to the statement and the district court overruled the objection and told the jury to "recall the testimony as they recall it."

The State's comment was not erroneous. During direct examination C.B. *appears* to say he touched her clitoris but was rather ambiguous in response to several follow-up questions from the prosecutor. The exchange between Sears' counsel and C.B. went as follows:

"Q. What do you consider the vaginal area? The State said touched you in your vaginal area. You said yes.
"A. In between the vaginal lips.
"Q. Okay. But you said he didn't actually touch you there. Right?
"A. No, ma'am.
"Q. But when the State just asked you that, didn't you agree that that had happened?
"A. No, ma'am.
"Q. Okay. Did not touch you in the vaginal area?
"A. No, ma'am."

17

The way the questions and answers were worded makes it a bit unclear on what C.B.'s answers were. It could be read as she was agreeing that Sears did not touch her vaginal area, or it could be read as she was disagreeing with Sears' counsel's question. Regardless, she indicated on direct examination that Sears touched her clitoris, bringing the State's comment during closing argument within the realm of fair comment on the evidence.

ii. *Evidence concerning Barrett's failure to discuss the allegations A.S. made concerning her abuse.*

Sears argues that the State erred by stating in closing argument that A.S.'s therapist, Barrett, never spoke to A.S. about abuse because A.S. never brought it up. In other words, it misstated the evidence. In its closing, the State said that

> "Ms. Barrett did not go over with [A.S.] the sexual abuse allegation, because [A.S.] never brought it up. [A.S.] never brought up that she had alleged her father abused her. She never brought up that she recanted. They didn't discuss either one, because [A.S.] didn't bring it up in the child led therapy session."

Sears objected and the district court instructed the jury to remember the evidence as they saw fit.

The State's comments were not erroneous based on the testimony presented at trial. During cross-examination, Barrett was asked if "[A.S.] ever [brought] up the sexual abuse allegation" and if she brought up her recantation of that allegation. Barrett said that she did not.

18

D. *Cross-examination question assumed facts not in evidence.*

Sears called a military colleague and friend of the Sears family as a character witness. The witness had no direct knowledge about the abuse alleged by C.B. and A.S. The testimony focused on the fact that his family socialized with the Sears family and that the Sears family was a good and loving family that appeared to communicate well with each other. Sears argues that the following exchange constituted reversible error because it assumed facts not in evidence and invaded the province of the jury.

> "Q. Do you think that Mr. Sears is a good person, knowing that he sexually touched
>    [C.B.]?
> "A. I know Michael Sears is a good person, yes.
> "Q. Even though he touched [C.B.]?"

Sears objected to this line of questioning and the district court sustained the objection. Even if this court assumes that the State's question was erroneous, it was not prejudicial under the circumstances. The jury was instructed to disregard testimony that was objected to where the objection was sustained. The district court did not immediately reinstruct the jury to disregard the question, but it had reminded the jury to disregard on several other occasions.

In sum, two of Sears' alleged instances of prosecutorial error were not erroneous under the circumstances. Instead, they were fair comments on the evidence elicited at trial. His third allegation of prosecutorial error, that the State erred during cross-examination of a witness, is harmless even if it was erroneous. The exchange was brief, Sears properly objected to the question, and the district court sustained the objection.

19

V.    CUMULATIVE ERROR DID NOT DEPRIVE SEARS OF A FAIR TRIAL

For his final issue regarding his trial, Sears argues that even if no single trial error deprived him of his right to a fair trial, then the cumulative impact of multiple errors did.

A. *We review whether any errors together or alone affected the outcome of the trial.*

Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional in nature, the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

B. *The cumulative error rule does not apply.*

If, as here, there are no errors or only a single error, the cumulative error rule does not apply. *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021). Because we assumed, without finding, that there was only a single trial error—the State's erroneous questioning of a witness during cross-examination—which we found to be harmless, the cumulative error rule does not apply.

VI.   THE DISTRICT COURT DID NOT ERR BY DENYING SEARS' MOTIONS FOR DEPARTURE

Sears' next argument on appeal is that the district court erred when it denied his motion for a departure to the grid and for a further durational departure.

A. *We review whether the court abused its discretion.*

When deciding a motion to depart in a Jessica's Law case, the district court must first review the mitigating circumstances without any attempt to weigh them against any aggravating circumstances. Then the district court determines, based upon all of the facts of the case, whether the mitigating circumstances rise to the level of "'substantial and compelling reasons'" to depart from the mandatory minimum sentence. *State v. Powell*, 308 Kan. 895, 913-14, 425 P.3d 309 (2018) (citing *State v. Jolly*, 301 Kan. 313, 324, 342 P.3d 935 [2015]).

An appellate court reviews the determination of whether substantial and compelling reasons to depart exist in a Jessica's Law case for an abuse of discretion. 308 Kan. at 902. That said, the district court does not err simply because it fails to announce that it has considered the defendant's mitigation evidence without weighing that evidence against any aggravating factors. In fact, K.S.A. 21-6627(d)(1) does not oblige a district court to state any of its reasons for *denying* a departure motion. 308 Kan. at 908.

B. *The district court did not abuse its discretion.*

To grant a departure in a Jessica's Law case, the district court must find substantial and compelling reasons exist to depart from the mandatory minimum. K.S.A. 21-6627(d)(1). "The term 'substantial' refers to something that is real, not imagined; something with substance and not ephemeral. The term 'compelling' implies that the court

is forced, by the facts of a case, to leave the status quo or go beyond what is ordinary." *State v. McKay*, 271 Kan. 725, 728, 26 P.3d 58 (2001).

Under K.S.A. 21-6627, a defendant who is over the age of 18 and is convicted of certain crimes involving a child under the age of 14 "shall be sentenced to a term of imprisonment for life with a mandatory minimum term of imprisonment of not less than 25 years" unless the crime is a first-time conviction of one of the listed crimes and there are substantial and compelling reasons to depart from the mandatory sentence. K.S.A. 21-6627(a)(1), (d)(1).

Sears raised several factors to support his motion for departure. First, he argued that he had no significant criminal history because these were his first convictions. He then argued that the amount of harm suffered was less than usual because A.S. recanted her allegations and did not display signs of abuse that her therapist could see. Similarly, according to Sears, C.B. did not attempt to distance herself from Sears' family and C.B.'s mother did not notice any change in C.B.'s behavior. Sears also pointed to his extensive employment history and military commendations as a "testament to the service he has provided the nation." Finally, he argued that Dr. Mark David Goodman's testimony that Sears was a very low risk to the community and a very low risk of committing a future sex offense was a sufficient reason to depart.

The district court determined that Sears' lack of criminal history was not a substantial and compelling factor because "if the legislature's intent was to give a departure to all people with no prior criminal history, it would have created a special category" for them. On appeal, Sears argues that the district court's determination was an abuse of discretion because it confuses the concept of a sentencing departure, which is decided on a case-by-case basis, and a presumptive sentence.

But when examining the context of the district court's comments, it is clear that the court did base its decision on the facts of this particular case. The district court stated:

"I feel like if the legislature's intent was to give a departure to all people with no prior criminal history, it would have created a special category for those who fall into the criminal history I category. And I would find this argument related to his lack of criminal history to be more persuasive if Mr. Sears had been convicted of only one offense, but in this case he was convicted of six offenses, some of which occurred on the same day, others which occurred on different days over the course of time.

"So this was not a one-time lapse in judgment, it was a pattern of conduct, and for that reason I find that the lack of criminal history, in light of the number of counts that he was convicted of, is not a substantial and compelling factor."

Beyond that, the district court considered Sears' other arguments and found them unpersuasive. The court disagreed that the degree of harm to A.S. and C.B. was less than typical because the jury found the defendant guilty of abusing A.S. over a period of time and C.B.'s victim impact statement revealed that the abuse had significant psychological impact on her. Nor did Dr. Goodman's testimony sway the court because it was "incongruent with the verdict" and Dr. Goodman acknowledged that his testing was not foolproof. The district court also considered, and dismissed, Sears' argument that a departure was appropriate given his military service and employment history due to the nature of the crimes. Finally, the court discounted the victim's support of leniency since it was a "mixed bag" with A.S. in favor of a departure while C.B. was not.

After examining the record, we find the district court's denial of Sears' motion for departure was not an abuse of discretion. The court did not deny the motion by mistakenly treating Sears' sentence as a presumptive sentence. Instead, the court considered Sears' arguments, including his lack of criminal history, and found them wanting. The court considered each of Sears' arguments and found that they were not

23

substantial or compelling reasons to depart under the circumstances. Sears has failed to establish that the court committed an error of fact, an error of law, or that its decision was unreasonable.

VII.  SEARS FAILED TO PROPERLY PRESERVE HIS ARGUMENT THAT KORA VIOLATES THE COMPELLED SPEECH DOCTRINE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

For his next argument on appeal, Sears argues his rights under the First Amendment to the United States Constitution are violated because he is required to register as a sex offender under the Kansas Offender Registration Act.

A. *Sears did not properly preserve this argument.*

Sears acknowledges that he did not object to his registration requirement before the district court. However, he argues that this court should address his arguments because (1) it involves only a question of law on proved or admitted facts and is determinative of the case and (2) consideration of the claim is necessary to prevent the denial of fundamental rights. See *State v. Godfrey*, 301 Kan. 1041, 1043, 350 P.3d 1068 (2015).

B. *We decline to review this issue for the first time on appeal.*

Several appellants have raised similar First Amendment challenges to KORA, which has led this court to repeatedly decline to review the issue for the first time on appeal. See *State v. Harpe*, No. 124,732, 2023 WL 5992237, at *8 (Kan. App. 2023) (unpublished opinion), *rev. denied* 318 Kan. ___ (February 2, 2024). In *State v. Pearson*, No. 125,033, 2023 WL 2194306, at *1 (Kan. App.), *petition for rev. filed* March 20, 2023, this court stated that it was refraining from addressing the issue for the first time on appeal because:

24

"Identifying the compelling governmental interests KORA is meant to protect and then determining whether it is sufficiently narrowly tailored to serve those interests involves examining a host of issues best explored first at the district court level. Analyzing the proportionality of KORA requires an in-depth balancing of its benefits and costs, along with exploring potential alternatives to achieving those benefits and the accompanying costs and anticipated effectiveness of those alternatives. It may even involve evaluating KORA's effectiveness in protecting the compelling governmental interests it is meant to serve, which could involve the presentation of evidence and fact-finding. And '[f]act-finding is simply not the role of the appellate courts.' [Citations omitted.]"

As this court noted in *Harpe*, the fact-finding aspect is especially important "given that this court has also declined to review this argument while noting that it has weak legal support." *Harpe*, 2023 WL 5992237, at *8. In *State v. Masterson*, No. 124,257, 2022 WL 3692859, at *2 (Kan. App.) (unpublished opinion), *rev. denied* 316 Kan. 762 (2022), this court stated that because "Masterson raises this issue for the first time on appeal, we need not address this issue. . . . Nevertheless, *if we were to address this issue*, it is legally and fatally flawed." (Emphasis added.) Most notably, federal courts have previously upheld the Sex Offender Registration and Notification Act, the federal equivalent to KORA. See *United States v. Fox*, 286 F. Supp. 3d 1219, 1221-24 (D. Kan. 2018). KORA has also survived a compelled speech challenge in the federal court system. *Davis v. Thompson*, No. 19-3051-SAC, 2019 WL 6327420, at *3 (D. Kan. 2019) (unpublished opinion).

"Laws that compel speech are constitutional only if they can survive strict scrutiny." *Harpe*, 2023 WL 5992237, at *8; see *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 642, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994). Strict scrutiny would require the State to show a compelling government interest that justifies restricting Sears' First Amendment rights, and that the restriction is narrowly tailored to achieve that interest. See *Hodes & Nauser, MDs v. Schmidt*, 309 Kan. 610, 680, 440 P.3d 461 (2019).

Because Sears did not challenge the KORA requirement below, that type of fact-finding is not available in the appellate record. Like the court in *Harpe*, we decline to address the issue for the first time on appeal.

VIII.  SEARS FAILED TO PROPERLY PRESERVE HIS ARGUMENT THAT KORA VIOLATES THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION

For his final argument on appeal, Sears argues that KORA violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution because some offenders are able to petition to remove themselves from the registry while others, such as Sears, are unable to do so.

A. *Our review of this issue is unlimited.*

Whether a statute violates equal protection is a question of law over which appellate courts have unlimited review. *State v. Mueller*, 271 Kan. 897, 902-03, 27 P.3d 884 (2001).

B. *Sears did not properly preserve this argument.*

Like in his compelled speech argument, Sears acknowledges that he failed to raise this issue before the district court but urges this court to address it for the first time on appeal.

C. *We decline to review this issue for the first time on appeal.*

Sears argues that the KORA requirement results in different treatment for similarly situated individuals. He argues that drug offenders and certain out-of-state offenders may be purged from KORA registration under certain circumstances while sex

26

offenders are not given the same opportunity. But, like this court found in *Harpe*, the equal protection argument also requires additional fact development. See *Harpe*, 2023 WL 5992237, at *9.

Appellate courts apply a rational basis test to equal protection challenges to a criminal statute when there is no suspect class at issue. See *State v. Huerta*, 291 Kan. 831, 834, 247 P.3d 1043 (2011). Statutes "may treat similarly situated individuals differently, without violating equal protection, if the classifications distinguishing individuals bear a rational relationship to a legitimate government objective." *Harpe*, 2023 WL 5992237, at *9. The party challenging constitutionality bears the burden of showing more than one set of facts in which the classifications of similarly situated individuals does not advance a government interest. "Under the rational basis standard, the party asserting that the statute is unconstitutional has the burden to negate '"every conceivable basis which might support"' the classification." *Alliance Well Service, Inc. v. Pratt County, Kansas*, 61 Kan. App. 2d 454, 476, 505 P.3d 757 (2022).

Like the defendant in *Harpe*, Sears "failed to bring this challenge before the district court" thus "the record is simply not sufficiently developed to allow us to conduct an adequate rational basis analysis." See *Harpe*, 2023 WL 5992237, at *9. Accordingly, we decline to address Sears' argument on appeal.

In sum, there was substantial evidence to support Sears' convictions. While some of the evidence presented at trial was cumulative, Sears fails to establish that the district court abused its discretion by admitting the cumulative evidence at trial. Under the circumstances of this case, the decision to admit the evidence was reasonable and not based on an error of law or an error of fact.

Sears also fails to establish that the State committed reversible prosecutorial error. The State's comments during closing were fair comments on the evidence presented at

trial. The State's comment during cross-examination was brief, properly objected to, and the district court sustained the objection. Any error made was harmless under the circumstances.

Nor did cumulative error deprive Sears of a fair trial. The State's erroneous cross-examination question was brief, and the district court sustained a quick objection to the question. A single error is insufficient to show that cumulative error deprived Sears of a fair trial.

The district court did not err in denying Sears' motion for departure. The district court carefully considered Sears' arguments and determined that there were not substantial and compelling reasons to support a departure to the grid and a further departure to a reduced grid sentence. The court's decision to deny the departure was not an abuse of discretion.

Finally, Sears fails to properly preserve his KORA arguments and we decline to address them due to a lack of necessary fact-finding before the district court.

Affirmed.